Roberto **GALLARDO, Jr., Individually and as Representative of the Estate of Roberto Gallardo, Deceased, Appellant,**

v.

**Adrian O. UGARTE, M.D., Appellee.**

No. 08–03–00374–CV.

Court of Appeals of Texas, El Paso.

June 10, 2004.

Rehearing Overruled Oct. 13, 2004.

Jay K. Gray, Bedford, for Appellant.

Angela Morrow Nickey Robles, Bracken, Coffman & Hughes, L.L.P., El Paso, for Appellee.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

The trial court dismissed this medical malpractice suit on the ground that the plaintiff failed to file an adequate expert report. We reverse and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

Roberto Gallardo died in August 1999. He was a resident of Sunset Haven Nursing Center and a patient of Appellee Adrian O. Ugarte. In July 2001, Gallardo's son, Appellant Roberto Gallardo, Jr., sued Sunset, Ugarte, and other health-care providers, claiming that they were negligent in caring for Gallardo.

In November 2001, Sunset filed a Motion to Acknowledge and Enforce Stay. The motion stated that Sunset's insurer had been placed into liquidation in Pennsylvania. The Pennsylvania court's Order of Liquidation, entered on October 3, 2001, included a ninety-day stay of all Pennsylvania proceedings in which the insurer was obligated to defend a party. The order also included a request that courts in other jurisdictions honor the stay on the basis of comity. The trial court in this case granted Sunset's Motion to Acknowledge and Enforce Stay and entered the following order:

[T]his matter is Stayed in compliance with the Order of Liquidation issued by the Commonwealth of Pennsylvania and

all matters pertaining to this suit are stayed for 90 days from October 3, 2001, including, but not limited to, discovery in this case, the trial of this case and all currently imposed deadlines until further notice.

■ In January 2002, Appellant served the defendants with an expert report by Dr. GundaKirk. On April 29, 2003, Ugarte filed a motion to dismiss the claims against him on the ground that Kirk's report did not constitute a good faith effort to comply with the definition of an expert report. The record does not reflect that Appellant filed a response to the motion to dismiss, and Appellant's counsel did not appear at the hearing on the motion. The trial court granted the motion to dismiss and later severed the claims against Ugarte from Appellant's remaining claims.[1]

### THE EXPERT REPORT REQUIREMENT

The Medical Liability and Insurance Improvement Act required a health-care-liability claimant to furnish an expert report within 180 days after the claim was filed. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986 (formerly codified as Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(d)).[2] " 'Expert report' means a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(r)(6). A defendant may challenge the adequacy of an expert report. The trial court must sustain the challenge "only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report...." *Id.* § 13.01(*l*). If the court sustains the challenge, it must dismiss the claim with prejudice. *Id.* § 13.01(e)(3).

### EXISTENCE OF THE STAY

■ In his first issue, Appellant argues that the trial court erred in dismissing his claims against Ugarte because the deadline for filing the expert report was suspended as a result of the stay. To support this argument, Appellant relies on cases involving the automatic stay provided for by the Texas Property and Casualty Insurance Guaranty Act.

The Act requires a stay of proceedings in which an "impaired insurer" is a party or is obligated to defend a party. *See* Tex. Ins.Code Ann. art. 21.28–C, § 17(a) (Vernon Supp.2004). "Impaired insurer" is defined in the Act as an insurer that has been placed in receivership, liquidation, or

---

1. Ugarte asserts that we must affirm because Appellant only filed a notice of appeal from the severance order, but his brief attacks the dismissal order. The notice of appeal states that Appellant is appealing "the Order Severing Causes entered on May 22, 2003, making final the Order of Dismissal entered on May 6, 2003...." A notice of appeal must "state the date of the ... order appealed from." Tex. R.App. P. 25.1(d)(2). We must construe the appellate rules reasonably but liberally, so the right of appeal is not lost by creating a requirement not absolutely necessary from the literal words of the rule. *Maxfield v. Terry,* 888 S.W.2d 809, 811 (Tex.1994). Viewed under this standard, we believe the notice of appeal sufficiently identifies the order being appealed.

2. After the trial court dismissed Appellant's claims against Ugarte, the Texas Legislature repealed article 4590i and replaced it with chapter 74 of the Civil Practice and Remedies Code. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 2003 Tex. Gen. Laws 847, 864, 884. We will cite the repealed statute because it is the version applicable to this case.

conservatorship "and that has been designated an impaired insurer by the commissioner." *See id.* § 5(9). "Commissioner" means the commissioner of insurance. *See id.* § 5(6).

The stay lasts for six months from the date the insurer is designated as impaired and for "any additional time thereafter as may be determined by the court...." *Id.* § 17(a). Analogizing to bankruptcy stays, courts have held that actions taken while the stay is in effect are void. *Builders Transp., Inc. v. Grice–Smith,* 63 S.W.3d 822, 823 & n. 2 (Tex.App.-Waco 2001, no pet.); *Burrhus v. M & S Mach. & Supply Co.,* 897 S.W.2d 871, 872–73 (Tex.App.-San Antonio 1995, no pet.).

The Fourteenth Court of Appeals has considered the effect of the stay on the deadline for filing an expert report. *See Tibbetts v. Gagliardi,* 2 S.W.3d 659 (Tex. App.-Houston [14th Dist.] 1999, pet. denied). In *Tibbetts,* the deadline for filing expert reports was in July 1997. *Id.* at 661. In April 1997, an automatic stay commenced because the insurer of two defendants was designated as impaired. *Id.* In April 1998, the defendants filed motions to dismiss because of the plaintiff's failure to file expert reports. *Id.* The defendants contended that the automatic stay was lifted in October 1997—six months after it took effect. *Id.* at 664. But the record did not contain an order lifting the stay and there was nothing to indicate that the stay was lifted in October. The record contained a letter, a docket entry, and a scheduling order indicating that the stay was extended to February 1998. *Id.* The appellate court therefore concluded that the stay was in effect until sometime in February 1998. *Id.* The court further concluded that the plaintiff was not required to file expert reports while the stay was in effect. *Id.*

Appellant argues that this case is factually similar to *Tibbetts.* The trial court's order stayed the proceedings for "90 days from October 3, 2001, including, but not limited to, discovery in this case, the trial of this case and all currently imposed deadlines until further notice." As Ugarte concedes, this language is confusing. It is not clear whether the trial court intended the stay to last for ninety days or until further notice. Focusing on the words "until further notice," Appellant argues that, as in *Tibbetts,* there is nothing in the record to show that the stay was ever lifted. Therefore, the stay remains in effect and the deadline for filing the expert report remains suspended.

Appellant did not make this argument in the trial court. As noted above, he did not file a response to the motion to dismiss or appear at the hearing on the motion. Although Appellant filed a motion for new trial, he did not argue that the stay was in effect when the trial court dismissed his claims against Ugarte, nor did he argue that he was not given notice of the motion to dismiss or of the hearing on the motion.

 To preserve an issue for appellate review, the complaining party must generally raise the issue in the trial court. *See* Tex.R.App. P. 33.1(a)(1). But jurisdictional issues may be raised for the first time on appeal. *McGuire v. McGuire,* 18 S.W.3d 801, 804–05 (Tex.App.-El Paso 2000, no pet.). There is authority for the proposition that a judicial action is void if taken during the pendency of a stay mandated by the Texas Property and Casualty Insurance Guaranty Act. *See, e.g., Burrhus,* 897 S.W.2d at 873. Here, however, there is nothing in the record to indicate that the Texas Commissioner of Insurance had designated Sunset's insurer as impaired. Thus, there is nothing to indicate that the stay was mandated by the Act. Instead, the record demonstrates that the

trial court granted the stay as an act of comity. Such a stay is within the discretion of the trial court. *See Sanchez v. Huntsville Indep. Sch. Dist.*, 844 S.W.2d 286, 291 (Tex.App.-Houston [1st Dist.] 1992, no writ) ("A motion to stay is directed to the discretion of the court. . . ."); *Interfirst Bank–Houston, N.A. v. Quintana Petroleum Corp.*, 699 S.W.2d 864, 877 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.) ("The decision to apply the doctrine of comity and to defer to a foreign court rests in the sound discretion of the forum court.").Appellant has not cited any authority for the proposition that a trial court's purported violation of its own stay order may be raised for the first time on appeal. We therefore conclude that this issue is not preserved for review.[3]

We also conclude that *Tibbetts* is distinguishable from this case. In *Tibbetts*, the record indicated that the stay had not been lifted. *See* 2 S.W.3d at 664. In this case, the record indicates that the stay had been lifted. The ninety-day period expired on January 1, 2002. On January 11, 2002, Appellant served the defendants with the expert report. Sunset, which requested the stay, filed discovery responses on January 25, 2002 and a designation of lead counsel on June 6, 2002. These actions suggest that Appellant and the party that requested the stay understood that the stay expired at the end of the ninety-day period. To the extent Appellant is asserting that the stay would remain in effect until the trial court gave "further notice," we note that the court signed an order on April 23, 2003, setting a hearing for May 6, 2003. Appellant's counsel's phone or fax number is listed on the order, and Appellant does not assert that he was unaware of the order. Thus, the trial court provided Appellant with notice that the stay was no longer in effect.

Appellant's first issue is overruled.

## ADEQUACY OF THE REPORT

### *The Legal Standards*

For the claimant to avoid dismissal, the expert report must represent a good-faith effort to provide a fair summary of the expert's opinions. *Am. Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 878 (Tex.2001). Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three elements—standard of care, breach, and causation—identified in the statute. *Id.* All of the relevant information must be contained within the four corners of the report. *Id.* To constitute a good-faith effort, the report must provide enough information to fulfill two purposes. "First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit." *Id.* at 879. A report does not fulfill these two purposes if it merely states the expert's conclusions about the standard of care, breach, and causation. *Id.* The expert must explain the basis of her statements so as to link her conclusions to the facts. *Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002). But a report's adequacy does not depend on whether the expert uses any particular "magical words." *Id.* at 53.

Regarding the standard-of-care and breach elements, the supreme court has stated: "Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient can-

---

**3.** Because the issue is not before us, we express no opinion as to whether a violation of a stay mandated by the Texas Property and Casualty Insurance Guaranty Act may be raised for the first time on appeal.

not be determined absent specific information about what the defendant should have done differently." *Palacios,* 46 S.W.3d at 880. Although the report need not include a full statement of the standard of care and how it was breached, it must explain what care was expected but not given. *Id.* Regarding the causation element, the supreme court has held that the expert report need not express the causal relationship in terms of "reasonable medical probability." *Bowie,* 79 S.W.3d at 53.

We review a trial court's determination about the adequacy of an expert report for abuse of discretion. *Palacios,* 46 S.W.3d at 877–78. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Bowie,* 79 S.W.3d at 52. We may not substitute our judgment for the trial court's judgment. *Id.*

### The Report

With these principles in mind, we now turn to Dr. Kirk's expert report. In the twenty-eight-page report, Kirk goes through the nurses' notes chronologically and provides commentary regarding deficiencies in the care rendered by Ugarte and others, including Sunset's nurses. The report discusses deficiencies in many areas, including the failure to prevent or adequately treat decubitus ulcers and the failure to prevent acute exacerbation of congestive heart failure.

Regarding decubitus ulcers, the report states that Gallardo had a stage II decubitus ulcer on his right hip on and off from January to April 1999.[4] By May 1999, the decubitus progressed to stage IV and eventually developed into cellulitis, requiring in-patient management with intravenous antibiotics and "surgical debridement with flap." From May 3 to mid-June, the treatment was not changed although the wound was clearly getting worse. The report further states:

> On March 1, 1999, the Treatment Nurse recommended a water mattress. The records do not reflect that Mr. Gallardo received a water mattress or any other type of off loading mattress. There are comments on the CDR noting that this (right hip decubitus) is a recurring problem and that resident favors his right side. However, neither Dr. Ugarte nor the Treatment Nurse address preventative measures except for recommending a water mattress which Mr. Gallardo did not get. Nor did he receive any other type of off loading mattress. More frequent checks by the CNA to insure he maintained a position change every two hours, padding his bed in such a manner as to maintain him in position and Granulex spray to pressure points are but a few of the things that ... could have been done to prevent as well as treat the decubitus. There is no evidence in the record that Mr. Gallardo received any of these preventive measures.

The report indicates that Sunset's nurses did not always inform Ugarte of

---

4. Ugarte asserts that this suit is based solely on Gallardo's death from aspiration pneumonia and acute exacerbation of congestive heart failure and that any information in the report that does not relate to these two illnesses is therefore irrelevant. We disagree. Appellant's petition expressly states that this is both a wrongful death *and a survival* suit. He requests damages for Gallardo's pain and suffering, and he specifically alleges that Ugarte was negligent in failing to ensure that Gallardo received appropriate skin treatment. Accordingly, our review is not limited to considering the report's conclusions regarding pneumonia and congestive heart failure. *See generally Felan v. Ramos,* 857 S.W.2d 113, 118 (Tex.App.-Corpus Christi 1993, writ denied) (describing the parameters of a survival action).

changes in Gallardo's condition, including changes related to decubitus. But the report also indicates that Ugarte saw Gallardo during the period that he had the decubitus, although it is not clear how often Ugarte saw him. The report states that a nurse consulted with Ugarte regarding decubitus on July 5. The next day, Ugarte saw Gallardo and admitted him to the hospital for the problem. Ugarte's progress notes for that day contain his first mention of decubitus.

Regarding acute exacerbation of congestive heart failure, the report states that the certificate of death lists that illness as a cause of death. The entry in the nurses' notes for February 6, 1999—approximately six months before Gallardo's death—states that Gallardo was hypotensive and that Ugarte decreased his dosage of digoxin. Kirk questions the decision to lower digoxin because it is not associated with hypotension.

> The entry for February 16, 1999 states: "Resident was getting hair cut when resident became unresponsive to painful/verbal stimuli." Dr. Ugarte notified and ordered digoxin level and decreased the frequency of Lanoxin from once a day to once every other day. Again, it is not clear why the doctor is decreasing the digoxin which increases the strength of the heart contraction. Mr. Gallardo has congestive heart failure and Dr. Ugarte is placing him at risk for an acute exacerbation of heart failure by lowering the digoxin. If the nursing assessment is accurate, Mr. Gallardo should have been placed on oxygen and a call to 911 should precede the call to Dr. Ugarte. Please note, Dr. Ugarte does not evaluate this incident or address it in his Progress Notes.

The entry for April 15, 1999 states that Gallardo's digoxin level was 0.6ng/ml and that therapeutic levels are 0.8–2.0ng/ml.

Kirk criticizes Ugarte for failing to address this laboratory report and failing "to increase the Lanoxin to a therapeutic level even though Mr. Gallardo has been hospitalized once this year for an acute exacerbation of CHF." There is nothing to indicate that Ugarte ever increased the digoxin after this date.

The report concludes with the following observations regarding Ugarte:

> Dr. Ugarte failed to meet the standard of care to accurately assess and diagnose Mr. Gallardo, to prescribe medications consistent with Mr. Gallardo's diagnosises and current prescribing standards, to prescribe an accurate dose of medication to treat the condition for which it was prescribed, to prescribe an appropriate medication, to provide treatment consistent with Mr. Gallardo's diagnosises and medical conditions and to follow established protocols and guidelines of nursing home and the State of Texas [sic].....

The breach in the standards of care by Sunset Haven Nursing Center, Dr. Adrian O. Ugarte, MD, and [Sunset's medical director] caused the death of Mr. Roberto Gallardo.

### Analysis

■ We conclude that the report represents a good-faith effort to provide a fair summary of Kirk's opinions. Regarding decubitus ulcers, the report states that more frequent checking by the CNA to insure that Gallardo maintained a position change every two hours, padding his bed, and applying Granulex spray "are but a few of the things that ... could have been done to prevent as well as treat the decubitus. There is no evidence in the record that Mr. Gallardo received any of these preventive measures." This statement explains the standard of care by listing the steps that could have been taken and ex-

plains how the standard of care was breached by noting that none of the steps were taken. Thus, the statement specifically addresses what care was expected but not given. *See Palacios,* 46 S.W.3d at 880. The statement addresses causation by indicating that if the proper steps had been taken, the decubitus could have been prevented or at least could have been prevented from progressing to stage IV. Although the statement does not use the word "causation," the words "could have been done to prevent as well as treat the decubitus" adequately convey the idea that failure to take the proper steps caused the decubitus or caused it to get worse. *See In re Tenet Hosps. Ltd.,* 116 S.W.3d 821, 826 (Tex.App.-El Paso 2003, orig. proceeding) (stating that the words "cause" or "causation" do not have to be used as long as a substitute word, phrase, or reference is used).Moreover, the report indicates that Ugarte undertook to treat Gallardo for the decubitus and Kirk expressly faults him for not ordering the proper steps to be taken.

Regarding acute exacerbation of congestive heart failure, the report reflects that Ugarte lowered Gallardo's dosage of digoxin approximately six months before he died. Approximately four months before his death, Gallardo's digoxin level was below the therapeutic level. There is no indication that Ugarte ever increased the digoxin after that date. Kirk opines that lowered digoxin increases the strength of the heart contraction and placed Gallardo at risk for an acute exacerbation of heart failure. Kirk also states generally that Ugarte failed to prescribe an accurate dose of medication. Finally, she expressly states that Ugarte's breach of the standard of care caused Gallardo's death.

The report expresses the standard of care by stating the therapeutic level of digoxin. It explains how Ugarte breached the standard by stating that he placed Gallardo at risk for an acute exacerbation of congestive heart failure by lowering the digoxin below the therapeutic level. The care that was expected but not given was that Ugarte would maintain Gallardo at an adequate dosage of digoxin. *See Palacios,* 46 S.W.3d at 880. The report addresses causation by stating that a lowered digoxin level increases the risk of acute exacerbation of congestive heart failure, that one of the causes of death was acute exacerbation of congestive heart failure, and that Ugarte's negligence caused Gallardo's death.

In short, the report adequately informs Ugarte of the specific conduct Appellant has called into question and it provides an adequate basis for the court to conclude that the claim has merit. *See Palacios,* 46 S.W.3d at 879. Appellant's second issue is sustained.

## CONCLUSION

For the reasons stated herein, the judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.