

## NUMBER 13-07-481-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

IHS ACQUISITION NO. 140, INC. D/B/A HARBOR
VIEW CARE CENTER; LYRIC HEALTH CARE
HOLDINGS III, INC.; AND LYRIC HEALTH
CARE, LLC,                                          Appellants,

v.

RUDY G. TRAVIS, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE OF
CHRISTINA APUSEN, DECEASED; DAVID K.
TRAVIS, JR.; AND MANUEL K. APUSEN, JR.,            Appellees.

On appeal from the County Court at Law No. 4
of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Memorandum Opinion by Justice Benavides**

In this interlocutory appeal, we evaluate challenges to the professional qualifications

of a medical expert and to the sufficiency of the expert report's "causation" analysis. We

first find that the trial court did not abuse its discretion by approving the expert's qualifications because his particular field of medical expertise—geriatric care—is substantially similar to the field of nursing home care, which is the field underlying the claim in this case. Second, we find that the trial court did not abuse its discretion by finding the causation analysis in the expert report comported with all statutory requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351, 74.402 (Vernon Supp. 2007). Because we discern no abuse of discretion, we affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

The appellants are IHS Acquisition No. 140, Inc. d/b/a Harbor View Care Center; Lyric Health Care Holdings III, Inc.; and Lyric Health Care, LLC (collectively "Harbor View"). Harbor View is a nursing home in Corpus Christi, Texas. The appellees are the estate and heirs of Christina Apusen[1] (collectively "the Apusens"), an elderly woman who was admitted to Harbor View on February 3, 2004 with numerous maladies: coronary artery disease, diabetes mellitus, hypertension, kidney failure, Alzheimer's dementia, peripheral vascular disease, osteoarthritis, depression, and esophageal reflux. The Apusens allege that Harbor View provided Ms. Apusen with negligent care and treatment while she was a resident.

Ms. Apusen entered Harbor View when she was seventy-four years of age and spent slightly more than one year there. According to her medical charts, while she was at Harbor View, the staff believed that she was at great risk for falling and injuring herself due to her poor balance and impaired vision and hearing.

On April 10, 2005, the Harbor View staff recorded an injury Ms. Apusen had

---

[1] The heirs are Rudy G. Travis, David K. Travis, and Manuel K. Apusen, Jr.

2

suffered to her right eye. The eye was purulent[2] and hot to the touch. At that time, Dr. Jesus Almanza prescribed drops of gentamycin, an antibiotic used to treat various bacterial infections. There is no record, however, of the drops being administered on April 10, 11, 12, or 13. Furthermore, medical chart notes reveal that one day earlier, on April 9, 2005, the nursing staff was ordered to conduct a complete blood count for Ms. Apusen, and the results of the blood count were not recorded on April 10, 11, 12, or 13.

On April 14, 2005, at 4:45 A.M., a nurse's note described Ms. Apusen as having a variety of ailments in her right eye—edema,[3] erythema,[4] heat, pain, and the presence of foul-smelling fluid. Gentamycin drops were finally administered to Ms. Apusen as treatment, but the injury had become so severe by this point that Ms. Apusen had to be transferred to Christus Spohn Hospital. There, she was diagnosed with an abscess of the eye, septicemia, and third-degree heart blockage. She also had an elevated white blood cell count.

Ms. Apusen died at Christus Sphon Hospital on May 10, 2005, slightly less than one month after having been transferred there from Harbor View. The death certificate is not available in the clerk's record, but Harbor View claims that the death certificate "stated the cause of death was cardiogenic shock,[5] precipitated by third-degree heart blockage,

---

[2] Purulent means containing, consisting of, or being pus. MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/purulent (last visited March 26, 2008).

[3] Edema is an abnormal infiltration and excess accumulation of serous fluid in connective tissue or in a serous cavity. MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/edema (last visited March 26, 2008).

[4] Erythema is an abnormal redness of the skin due to capillary congestion. MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/erythema (last visited March 26, 2008).

[5] Cardiogenic shock is characterized by a decreased pumping ability of the heart that causes a shocklike state, http://www.emedicine.com/EMERG/topic530.htm (last visited March 26, 2008).

septicemia, and eye abscess formation," and the Apusens do not contest this.

On October 30, 2006, the Apusens filed a negligence suit against Harbor View, alleging that the nursing home had breached the applicable standard of care by failing to properly monitor Ms. Apusen's eye injury.[6]  Harbor View answered with a general denial.

On February 19, 2007, the Apusens provided Harbor View with an expert report from Perry Starer, M.D., of New York City.  Dr. Starer completed a fellowship in geriatrics at the Mount Sinai School of Medicine in New York in 1985, received board certification in this field in 1988 (and recertification in 1999), and has served as a professor of geriatric medicine since 1985.  His curriculum vitae reveals that he is the author or co-author of twenty-one peer-reviewed articles, two textbook chapters, two book reviews, and three abstracts.  Nearly every one of his writings deals with topics pertaining to medical care of the elderly.  The expert report opined, in part:

> If timely diagnosed, this type of infection is, more likely than not, treatable. In my opinion, had it been appropriately treated in a timely manner, Ms. Apusen would have recovered from her infection.  However, because it was not appropriately treated in a timely manner, Ms. Apusen went on to experience septicemia and death.
>
> . . . .
>
> The standard of care is to monitor for signs and symptoms of infection/septicemia in the patient and to provide prompt treatment.  It is my opinion that the deviation from the standard of care led to septicemia with the consequence that Ms. Apusen's body was unable to overcome these conditions which ultimately led to her death.

On March 12, 2007, Harbor View filed a motion to dismiss for failure to comply with chapter 74 expert report requirements.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351,

---

[6] The Apusens also filed suit against Dr. Almanza, the physician who originally prescribed gentamycin drops to treat Ms. Apusen's eye condition, but he is not a party to this appeal.

4

74.402.  In the motion, Harbor View argued that (1) Dr. Starer was not qualified to render an opinion regarding standards of care in a nursing home because he specialized in geriatrics, not nursing home care; and (2) the opinions presented within the "four corners" of Dr. Starer's expert report failed to establish a causal link between Harbor Care's alleged negligence and Ms. Apusen's death.

On April 27, 2007, the court held a hearing on Harbor View's motion to dismiss.  At the hearing, the Apusens first argued that Dr. Starer's lack of experience in nursing home care was unimportant because Dr. Starer is experienced in geriatrics, a field that is substantially similar to nursing home care and which would qualify him to offer opinions on the standard of care in nursing homes.

The Apusens also contested Harbor View's argument that the report had not sufficiently established causation.  Harbor View's counsel argued that the expert report failed to establish causation because Dr. Starer had made an unfounded assumption that the failure to treat Ms. Apusen's eye injury was the cause of the septicemia.  This conclusory assumption, Harbor View argued, did not sufficiently explain what happened during the one month between Ms. Apusen's admission to the hospital and her death.  The trial court, however, disagreed, stating on the record that cardiogenic shock "occurs sometimes when they all—this proliferates the system . . . . That [one month gap] is what causes the abscess to grow in the system and proliferate.  The month is the generation of the toxins and the infection."  Harbor View protested that this statement by the trial court—whether or not it was accurate—constituted an impermissible departure from the "four corners" of the expert report.

On July 11, 2007, the trial court issued a written order denying Harbor View's motion to dismiss. Harbor View now appeals.[7]

## II. STANDARD OF REVIEW

A trial court's denial of a motion to dismiss based on the sufficiency of an expert report is reviewed for abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex. 2001). An abuse of discretion occurs when a trial court acts in an unreasonable and arbitrary manner or when it acts without reference to any guiding principles. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). This does not mean that we may reverse a trial court's ruling on the sufficiency of an expert report merely because we may have decided the matter differently. *See id.* at 840*.* Instead, we review whether the trial court could have reasonably determined that the report represented a good faith effort to comply with the expert report requirements set forth in chapter 74 of the civil practice and remedies code. *See Palacios*, 46 S.W.3d at 880.

An expert report must provide a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). A "fair summary" is not a full statement of the applicable standard of care and how it was breached; it is merely an explanation of the care that was reasonably expected and not given. *Palacios*, 46 S.W.3d at 880. "A plaintiff need not present evidence in the report as

---

[7]We have jurisdiction to review a trial court's denial of a motion to dismiss based on an allegedly deficient expert report in a health-care liability claim where, as here, the trial court has not concurrently granted a one-time extension allowed under section 74.351(c) to cure alleged deficiencies. *Lewis v. Funderburk*, No. 06-0518, 2008 Tex. LEXIS 312, at *5-8 (Tex. April 11, 2008); *see Ogletree v. Matthews*, No. 06-0502, 2007 Tex. LEXIS 1028, at *16 (Tex. Nov. 30, 2007) (holding that "[n]o interlocutory appeal is permitted when a served expert report is found deficient and an extension of time granted.").

if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

Finally, "because the statute focuses on what the report discusses, the only information relevant to the [appellate] inquiry is within the four corners of the document." *Id.* at 878.

### III. ANALYSIS

Harbor View's two challenges to the expert report are (1) that Dr. Starer is unqualified to opine on the standard of care in nursing homes; and (2) even if he was qualified, his report did not adequately establish a causal link between Harbor View's alleged negligence and Ms. Apusen's death. We do not believe, however, that Harbor View has demonstrated that the trial court's decisions on these issues were an abuse of discretion.

### A. DR. STARER'S QUALIFICATIONS

An expert who gives opinion testimony regarding whether a health care provider departed from accepted standards of health care must be qualified to testify under section 74.402 of the civil practice and remedies code. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(5)(B). This means that the expert is qualified if he/she is "board certified or has other substantial training or experience in the area of medical practice relevant to the claim; and is actively practicing medicine in rendering medical care services relevant to the claim." TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(c).

The statute, reasonably construed, does not require that the expert be involved in the exact same field as the health-care-provider defendant; it merely requires that the

expert have the "'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (quoting *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996)). In *Roberts*, for example, a physician who was board-certified in pediatrics, but not neurology, was nevertheless permitted to offer expert opinions on neurological injuries because the particular issue in the case involved a pediatric neurological injury, which was a particular area of pediatrics in which the expert had demonstrated considerable knowledge and experience. *Id.*

This means that "a qualified expert in a *similar field* may testify as to the accepted standards of care if he can demonstrate within the report that he possesses knowledge about the 'care or treatment delivered by the defendant' and the 'diagnosis, care or treatment of the condition involved in the claim.'" *Wissa v. Voosen*, 243 S.W.3d 165, 170 (Tex. App.–San Antonio 2007, pet. denied) (quoting § 74.402(b)) (emphasis added); *see also Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 760-62 (Tex. App.–Houston [14th Dist.] 2007, no pet.); *Foster v. Zavala*, 214 S.W.3d 106, 114 (Tex. App.–Eastland 2006, pet. filed); *Group v. Vicento*, 164 S.W.3d 724, 731 (Tex. App.–Houston [14th Dist.] 2005, pet. filed); *Methodist Health Care Sys. of San Antonio, Ltd. v. Rangel*, No. 04-05-00500-CV, 2005 Tex. App. LEXIS 10858, at *6 (Tex. App.–San Antonio Dec. 14, 2005, pet. denied) (mem. op.) ("A medical witness who is not of the same school of practice may be qualified to testify if he or she has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those that confronted the defendant charged with malpractice.").

8

The essential claim in this case concerns the standard of care that should be applied in nursing homes, which are facilities where elderly and infirm persons reside. Thus, the relevant question is not the narrow issue of whether Dr. Starer has worked in a nursing home, it is the broader issue of whether he is knowledgeable about the standard of care applicable to elderly and infirm persons. On this point, Dr. Starer, by citing his extensive experience in the field of geriatrics, certainly demonstrates within his report that he possesses knowledge about the "care or treatment delivered by the defendant" and the "diagnosis, care or treatment of the condition involved in the claim." *Wissa*, 243 S.W.3d at 170.

According to his expert report, Dr. Starer's fellowship, which he completed at the Mount Sinai School of Medicine in New York, was in the field of geriatrics. He is board certified in geriatrics. Since 1985, he has served as the Chief of the Geriatrics Section at City Hospital at Elmhurst in New York. Additionally, he served as an attending physician at a long-term care facility (the Jewish Home and Hospital for the Aged) between 1985 and 1999. Dr. Starer's experience in daily practice is also buttressed by experience in academia. For nearly twenty-three years, he has served as a professor of geriatric medicine.

Harbor View questions how this knowledge of geriatrics is related to knowledge of nursing home care, but that question is answered merely by a cursory glance at Dr. Starer's publications, which include titles such as, "Sequential outbreak of influenza A and B in a nursing home"; "Medical care of the elderly in the nursing home"; "The association of incontinence and mortality in elderly nursing home patients"; and "Care of the nursing home patient." This is but a sampling of his published papers, which in the aggregate,

9

exhibit a lengthy engagement with elderly care issues throughout his career.

The facts in the instant case are analogous to the facts in *Cresthaven Nursing Residence v. Freeman*,  134 S.W.3d 214, 233-34 (Tex. App.–Amarillo 2003, no pet.).  In *Freeman*, a physician who practiced occupational medicine was found qualified to opine on nursing home care under section 74.402, not because he was knowledgeable about nursing home care per se, but because he was knowledgeable about the type of injury that the nursing home patient had suffered—a urinary tract infection—and how it would affect the patient.  *Id*.  Dr. Starer is similarly situated.  He may not have spent his entire career working in nursing homes—although it is worth noting that he spent fourteen years working at a long-term care facility in New York—but his curriculum vitae demonstrates that he is knowledgeable about the types of people who reside in nursing homes, their afflictions, and most importantly, the relevant treatment and standard of care for such patients.

Thus the trial court did not abuse its discretion in finding that Dr. Starer was qualified to opine on the standard of care at Harbor View, and we must reject Harbor View's first issue.

## B.    THE ADEQUACY OF DR. STARER'S CAUSATION OPINION

Harbor View next argues that even if Dr. Starer were professionally qualified to opine on nursing home standards of care, his expert report is inadequate because it fails to provide a fair summary of the causal relationship between Harbor View's alleged negligence and Ms. Apusen's death.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Specifically, Harbor View argues that the report, within its "four corners," does not directly explain how the nursing home's failure to monitor and treat Ms. Apsuen's eye injury caused her death by cardiogenic shock.  Harbor View also argues that the trial

10

court's finding that the causation analysis was sufficient relied upon impermissible inferences. We disagree.

## 1. Causation is Demonstrated Within the Four Corners of the Expert Report

Expert reports must provide the expert's opinions as to "the manner in which the care rendered by the . . . health care provider failed to meet the standards [of care], and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). The expert report must not be conclusory in its explanation of causation; it must provide "sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). This does not mean that a report's adequacy depends upon any particular "magic words." *Bowie Mem'l Hosp.*, 79 S.W.3d at 53; *Gallardo v. Ugarte*, 145 S.W.3d 272, 277 (Tex. App.–El Paso 2004, no pet.).

The expert must provide bases for his statements and link conclusions to facts. *Palacios*, 46 S.W.3d at 875. The causation analysis must be contained within the "four corners" of the report, and a trial judge is not permitted to make inferences beyond the four corners. *Patel v. Williams*, 237 S.W.3d 901, 905 (Tex. App.–Houston [14th Dist.] 2007, no pet.).

In the instant case, we do not believe the trial court abused its discretion when it found that Dr. Starer's report satisfied the above criteria. To begin, Dr. Starer provided reasonable bases for his opinions by explaining that he learned about the facts of the case from Ms. Apusen's medical records and death certificate and that he applied methodologies which are employed by all physicians in both lawsuits and in peer-review

11

settings. The text of his report provided a fair summary of the standard of care by explaining that when an elderly patient has an eye injury such as Ms. Apusen's, she is at unique risk for infection, sepsis, and eventually death, and therefore the "standard of care is to monitor for signs and symptoms . . . and to provide prompt treatment." Next, the report explained that this standard was presumably unmet, as indicated by daily empty spaces in the medical records where descriptions of her condition and results of blood tests would ordinarily appear. Dr. Starer's report states that on three consecutive days following the critical injury, "there is no description of Ms. Apusen's right eye in the Nursing Notes." Nor, the report continues, is there any indication in the records that Ms. Apusen was administered gentamycin drops on the day they were first prescribed.

Finally, Dr. Starer's report asserted causation by explaining that Harbor View's inattention to Ms. Apusen allowed septicemia to develop "with the consequence that Ms. Apusen's body was unable to overcome these conditions which ultimately led to her death." Dr. Starer also wrote about the seriousness of orbital abscesses, explaining that "intensive antibiotic therapy" and "frequent monitoring of systemic and oracular parameters is essential." Dr. Starer then expressed his ultimate conclusion thus:

> The standards of care in this situation are clear and they were not followed. If timely diagnosed this type of infection [septicemia] is more likely than not, treatable. In my opinion, had it been appropriately treated in a timely manner, Ms. Apusen would have recovered from her infection. However, because it was not appropriately treated in a timely manner, Ms. Apsuen went on to experience septicemia and death.

This language is strikingly similar to language in an expert report that was recently approved by the El Paso Court of Appeals. *Gallardo*, 145 S.W.3d at 279. In *Gallardo*, the estate of a deceased nursing home patient sued the nursing home, alleging that it was negligent in not properly monitoring and treating a decubitus ulcer which eventually led to

12

the death of the patient. *Id.* at 274. The expert report offered by the plaintiff in *Gallardo* concluded that:

> More frequent checks by the CNA to insure he maintained a position change every two hours, padding his bed in such a manner as to maintain him in position and Granulex spray to pressure points are but a few of the things that . . . could have been done to prevent as well as treat the decubitus. There is no evidence in the record that Mr. Gallardo received any of these preventive measures.
>
> . . . .
>
> Mr. Gallardo should have been placed on oxygen and a call to 911 should precede the call to Dr. Ugarte. Please note, Dr. Ugarte does not evaluate this incident or address it in his Progress Notes.
>
> . . . .
>
> Dr. Ugarte failed to meet the standard of care to accurately assess and diagnose Mr. Gallardo, to prescribe medications consistent with Mr. Gallardo's diagnoses and current prescribing standards, to prescribe an accurate dose of medication to treat the condition for which it was prescribed, to prescribe an appropriate medication, to provide treatment consistent with Mr. Gallardo's diagnosises and medical conditions and to follow established protocols and guidelines of nursing home and the State of Texas. . .

*Gallardo*, 145 S.W.3d at 279.

In both the instant case and in *Gallardo*, the principle that emerges is that an expert report provides a "fair summary" of causation if it explicates what a nursing home (or physician) should have done but did not do, and then it explains that the inattention caused otherwise treatable medical conditions to become fatally unmanageable. *Id.* at 280 (finding that the report "addresses causation by indicating that if the proper steps had been taken, the decubitus [ulcer] could have been prevented or at least could have been prevented from progressing"); s*ee also Sides v. Guevara*, No. 08-06-00213, 2007 Tex. App. LEXIS 7064, *17-18 (Tex. App.–El Paso Aug. 30, 2007, no pet.) (citing *Gallardo*, 145 S.W.3d at

13

279).  The *Gallardo* court further emphasized that, "although the statement does not use the word 'causation,' the words 'could have been done to prevent as well as treat the decubitus' adequately convey the idea that failure to take the proper steps caused the decubitus or caused it to get worse." *Id.* at 280.  Applying this same analysis to the instant case, it seems apparent to us that the trial court's finding that Dr. Starer's report provided a fair summary of causation was not an abuse of discretion.

Harbor View contends that this Court should find in its favor in light of our holding in *Meyers v. Golden Palms Retirement & Health Ctr., Inc.*, No. 13-06-289-CV, 2007 Tex. App. LEXIS 4098 (Tex. App.–Corpus Christi May 24, 2007, pet. denied) (mem. op.).  We believe, however, that *Meyers* is inapposite.  In *Meyers*, a nurse assistant in a retirement center moved an elderly patient from a wheelchair to a hospital bed, even though, according to internal procedures at the retirement center, the patient should have been moved by two nurses, not just one.  *Id.* at *1-2.  The patient injured her femur, and she sued the retirement center.  *Id.* at *2.  The plaintiff's expert report stated that the one-person removal violated internal policy, but the report did not state that the femur injury could have been avoided with a two-person removal.  *Id.* at *7.  The trial court found this explanation of causation insufficient and dismissed.  *Id.* at *1.  We affirmed.  *Id.* at *16.

Harbor View suggests that the situation in the instant case is analogous to the situation in *Meyers* and, therefore, in order to be consistent in our jurisprudence in this area, we must now reverse.  We believe, however, that Harbor View misreads *Meyers*. *Meyers* evaluated whether the trial court had abused its discretion; it was not a *de novo* review of the adequacy of the causation analysis linking the patient's removal to her femur injury.  *Id.* at *5.  Indeed, our opinion explained that we had significant doubts about the

trial court's assessment, but we recognized that we were not charged with re-hearing the facts. *Id.* at *13. Rather, we were charged with assessing whether the trial court had abused its discretion. *Id.* The following language from *Meyers* is critically important:

> The report does not state that the incident would have been avoided had there been a two-person transfer. The expert did not explain how the purported negligence caused the broken leg, nor does the report mention that the broken leg would not have occurred had she been transferred by two persons. The report does not flesh out how the failure to comply with the MDS caused the injuries. *Although we might have decided the issue differently, we cannot say that the trial court acted contrary to guiding Texas law, particularly because the case law affords discretion.*

*Id.* (emphasis added). We further explained that "[d]iscretion, at its most basic level, means choice. Trial court discretion is important because it is impossible for appellate courts to monitor all trial court rulings in a precise manner because the facts and circumstances are so varied." *Id.*

We stand by that language, and absent any evidence that a trial court acted in an unreasonable and arbitrary manner or that it acted without reference to any guiding principles, we may not hold that it abused its discretion. *Walker*, 827 S.W.2d at 839. In the instant case, the trial court appears to have acted in deference to the guiding principles about causation analysis which are enunciated in *Gallardo*. *Gallardo*, 145 S.W.3d at 279. Thus, we cannot find that the trial court abused its discretion.

## 2. The Trial Court Did Not Rely Upon Improper Inferences

Finally, Harbor View argues that the trial court abused its discretion by making an improper inference about causation that was not within the "four corners" of the expert report. Specifically, Harbor View alleges that the expert report failed to address a "one-month gap" between the point at which Ms. Apusen's eye abscess was treated on April 14

and her death due to cardiogenic shock on May 10.  Thus, Harbor View argues that the trial court's comment regarding that month constitutes an impeachable inference.[8]  We disagree.

In *Palacios*, the supreme court specifically ruled that although an expert report needed to be a "fair summary," a fair summary was not a "full statement of the applicable standard of care and how it was breached."  *Palacios*, 46 S.W.3d at 879.  This implies that there is some level of ambiguity—something less than an absolutely full description—that is subject to the independent analysis of the trial court.  *Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P.*, 185 S.W.3d 65, 68 (Tex. App.–San Antonio 2005, pet. denied) ("[A] fair summary is something less than all the evidence necessary to establish causation at trial").

In the instant case, when the trial court commented on the cause of Ms. Apusen's toxic shock, it stated that the one-month "gap," which Dr. Starer did not address in his expert report, was the time which "causes the abscess to grow in the system and proliferate."  The reporter's record reveals that these comments were intended as an explanation of concepts which were mentioned, but not defined, within Dr. Starer's report.  Thus, the trial court's explanation was only beyond the "four corners" of the report in the sense that the trial court explained medical concepts—such as abscess and cardiogenic shock—which Dr. Starer did not explain.  The trial court, however, did not propose unique causation theories that were not discussed in the expert report.

---

[8] The trial court stated that the month-long gap is "what causes the abscess to grow in the system and proliferate; the month is the generation of the toxins and the infection."

16

We believe that Dr. Starer's report, which explained causation, but which did not explain certain medical concepts that would perhaps need to be explained at trial, was "less than all the evidence necessary to establish causation at trial," but still provided a "fair summary" of causation. *See id.* at 68. We further believe the trial court's comments about the one-month gap were merely more detailed explanations of the expert report's concepts, not inferences. Harbor View provides no citations otherwise. The trial court's comments were not an improper "inference" and do not constitute an abuse of discretion.

## IV. CONCLUSION

We find that the trial court did not abuse its discretion in finding either that Dr. Starer was qualified to opine on nursing home standards of care or that his expert report satisfactorily addressed causation under chapter 74. We thus reject Harbor View's claim that it is entitled to attorneys' fees and court costs under chapter 74. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(1). We AFFIRM the judgment of the district court.

_____
GINA M. BENAVIDES,
Justice

Memorandum Opinion delivered and
filed this the 24th day of April, 2008.

17