Affirmed and Opinion filed May 29, 2008








Affirmed
and Opinion filed May 29, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00639-CV

____________

 

SAN JACINTO METHODIST HOSPITAL AND
NEW TRIUMPH HEALTHCARE OF TEXAS, LLC, D/B/A/ TRIUMPH HOSPITAL EAST HOUSTON, Appellants

 

V.

 

ERIC BENNETT, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE OF MARY JANE TAYLOR DECEASED, Appellee

 



 

On Appeal from the 165th
District Court

Harris County, Texas

Trial Court Cause No. 06-77425

 



 

O P I N I O N








In this interlocutory appeal in a health-care-liability
case, two hospitals challenge the trial court=s denial of their
respective objections to the plaintiff=s expert witness
report and motions to dismiss under Texas Civil Practice and Remedies Code
section 74.351.  We conclude the trial court reasonably could have determined
that the plaintiff=s expert report was sufficient to meet the
relevant requirements of the statute in relation to all claims the plaintiff
was asserting at the time of the trial court=s orders.  We
therefore hold the trial court did not abuse its discretion in denying the
hospitals= objections and motions to dismiss.

I.  Factual and Procedural
Background

Appellee Eric Bennett, individually and as representative
of the estate of his mother, Mary Jane Taylor, filed a medical health care
liability claim against appellants San Jacinto Methodist Hospital (AMethodist@) and New Triumph
Healthcare of Texas, LLC, d/b/a/ Triumph Hospital East Houston (ATriumph@).  Bennett sought
recovery under the Texas wrongful death and survival statutes[1]
for injury and death allegedly resulting from Methodist=s and Triumph=s negligent
diagnosis and treatment of his mother=s dicubitus ulcer,
commonly known as a Abed sore.@

Bennett=s petition contains the following
allegations:

!       On September 24, 2004, Taylor arrived at
Methodist with breathing problems, and she was admitted to Methodist.  

!       During her stay at Methodist, she began to
develop a bed sore.  On November 15, 2004, Taylor was transferred to Triumph
for management of respiratory failure.  

!       During her stay at Triumph, Taylor=s bed sore progressed to stage
four, penetrating to the bone.  

!       On November 30, 2004, Taylor returned to
Methodist, and on January 11, 2005, she was transferred to Select Speciality
Hospital, where she underwent skin grafts and a skin flap.  

!       Taylor remained hospitalized until October
27, 2005, when she died. 








On April 9, 2007, Bennett timely filed a report by Dr.
Timothy Hammond, Aan academic internist and nephrologist.@[2]  Dr. Hammond
stated he was Aboard certified in internal medicine and this
certification is valid indefinitely.  I was board certified in nephrology from
1996 to 2006 and am currently in the process of renewal.  These certifications
directly address the subject matter of this claim, as the claim relates to
management of decubitus ulcers.@  Dr. Hammond also stated he was
practicing medicine at all times relevant to the claims made in the case and
was actively practicing at the time of his opinion.  He continued, stating:

I have either has [sic] training as, and/or served as a consultant,
and/or observed healthcare providers in the same fields as the defendant
healthcare providers named in the Taylor case.  Therefore, I have knowledge of
accepted standards of medical care for the diagnosis, care, or treatment of the
illness, injury, or condition involved in the claim, as the claim relates to
the prevention and management of decubitus ulcers.  I am familiar with the standard
of care for both nurses and physicians for the prevention and treatment of
decubitus ulcers.  I give direct care to patients with decubitus ulcers and was
doing so at all times relevant to this case.  As such, I am also familiar with
the consequences of improper management of decubitus ulcers that is not within
the standard of care.

 

After listing the records he reviewed and summarizing the
details of Taylor=s clinical  and medical history, Dr.
Hammond opined that the following evidence supported the claim that Taylor=s skin integrity
was breached during her first stay at Methodist:  (1) a January 12, 2005 wound
care progress note from Select Speciality Hospital indicating the Asacral decubiti
are 22 months old,@ and (2) inclusion
of an order for Duoderm to the sacrum in the November 15, 2004 transfer orders
to Triumph.  Dr. Hammond also opined that Taylor=s laboratory
results from Methodist were Aconsistent with prolonged dehydration and
malnutrition as evidence[d] by BUN/Creatinine rations [sic] >20 (Ratio) and
low albumin and pre-albumin levels . . . .@  He then provided
the supporting tabulations.








Regarding Taylor=s stay at Triumph,
Dr. Hammond reported, among other matters, that Taylor Adeveloped
Pseudomonas bacteremia, and had ongoing malnutrition.@[3]  He further
observed that a sacral decubitus was noted in the hospital discharge summary,
but no skin care documentation was included in this record.  He provided the
pre-albumin levels in Taylor=s blood and the elevated BUN-to-creatinine
ratios, which he explained provided evidence of poor nutrition and poor
hydration, respectively.  He observed that, on Taylor=s readmission to
Methodist, a Anursing assessment lists skin as impaired, and
integumentary assessment as Stage II pressure ulcer to buttocks.  Initial wound
assessment on 12/01/2004 documents 6 cm by 7cm sacral area wound . . . and
Stage 3on [sic] the wound care assessment records.@[4]  Finally, Dr.
Hammond observed, AThe [Methodist] ICU nursing progress notes
list the decubitus as Stage 4 on 12/2/2004 and repeatedly through 12/20/2004.@

Regarding the general standard of care for decubitus
ulcers, Dr. Hammond stated in his report:

The
standard care for decubitus ulcers is to make an initial survey of skin
integrity, assess risk for ulcers with a scale such as the Braden scale, and
follow up with skin care nursing and protocol interventions when decubitus
ulcers are detected.  The patients should have their nutrition and hydration
optimized to prevent formation of new ulcers and enhance healing of existing
ulcers.  There should be a process of ongoing assessment[,] reassessment[,] and
care planning to prevent, detect, and manage decubitus ulcers, and treatable
predisposing factors such as nutrition and hydration.

 

Hammond
then repeated, virtually verbatim, the same standard of care for the staffs of
Methodist and Triumph.

Under the heading of Abreaches of the
standard of care,@ Dr. Hammond stated the following
regarding Methodist=s staff:








The staff
of San Jacinto Methodist Hospital breached the standard of care by failing to
perform an initial survey of skin integrity, assessment for risk for ulcers
with a scale such as the Braden scale, and following up with skin care nursing
and protocol interventions when decubitus ulcers were detected.  The staff of
San Jacinto Methodist Hospital breached the standard of care by not optimizing
the patient=s nutrition and hydration to prevent formation of new
ulcers and enhance healing of existing ulcers. The staff of San Jacinto
Methodist Hospital breached the standard of care by failing to perform ongoing
assessment, reassessment and care planning to prevent, detect, and manage
decubitus ulcers, and treatable predisposing factors such as poor nutrition and
hydration.

The
breaches of the standard of care by the staff of San Jacinto Methodist Hospital
were the proximate cause of Ms. Taylor=s
decubitus ulcer formation and failure to heal, poor nutrition and poor
hydration as specifically set forth below.

The staff
of San Jacinto Methodist Hospital, by not optimizing the patient=s nutrition and hydration caused the formation of
decubitus ulcers.  Furthermore, the staff of San Jacinto Methodist Hospital
breached the standard of care by failing to perform ongoing assessment,
reassessment and care planning to prevent, detect, and manage decubitus ulcers,
and treatable predisposing factors such as poor nutrition and hydration
breaches of the standard of care were the proximate cause of Ms. Taylor=s decubitus formation and failure to heal a decubitus,
together with poor nutrition and poor hydration.








By failing
to perform an initial survey of skin integrity, assessment for risk for ulcers
with a scale such as the Braden scale, and following up with skin care nursing
and protocol interventions when decubitus ulcers were detected, as well as
failing to optimize the patient=s nutrition and
hydration to prevent formation of new ulcers and enhance healing of existing
ulcers as well as failing to perform ongoing assessment, reassessment and care
planning to prevent, detect, and manage decubitus ulcers, and treatable
predisposing factors such as poor nutrition and hydration.  The staff of San
Jacinto Methodist Hospital allowed the patient to develop decubitus formation
and further promoted failure to heal through poor nutrition and poor
hydration.  The care provided to Mary Jane Taylor by the staff of San Jacinto
Methodist was below the community standard of care, and did harm to Ms. Taylor,
being the proximate cause of her decubitus formation and failure to heal
because of poor nutrition and poor hydration.  Specifically, the staff of San
Methodist Hospital breached the standard of care by failure to ensure an
initial survey of skin integrity, assessment for risk for ulcers with a scale
such as the Braden scale, and follow up with skin care nursing and protocol
interventions when decubitus ulcers were detected.  The staff of San Jacinto
Methodist Hospital breached the standard of care by not optimizing the patient=s nutrition and hydration to prevent formation of new
ulcers and enhance healing of existing ulcers.  The staff of San Jacinto
Methodist Hospital breached the standard of care by failing to perform ongoing
assessment reassessment and care planning to prevent, detect, and manage
decubitus ulcers, and treatable predisposing factors such as poor nutrition and
hydration.

Had the standard of care been met by the staff of San Jacinto Methodist
Hospital as outlined above, the specific outcome, based upon reasonable medical
probability, would have been prevention and healing of decubitus formation, and
maintenance of good nutrition and hydration.

 

Dr.
Hammond then repeated verbatim the same opinion regarding the breaches of the
standard of care by Triumph=s staff.

After providing a legal definition of Aproximate cause,@ including the
concepts of cause in fact and foreseeability, Dr. Hammond opined:

The breaches of the standard of care by the staff of San Jacinto
Methodist Hospital were a proximate cause of Ms. Taylor=s injuries, which included
decubitus formation, failure to heal, and poor nutrition and hydration.

The breaches of the standard of care by the staff of Triumph Hospital B East Houston were a proximate
cause of Ms. Taylor=s injuries, which included
decubitus formation, failure to heal, and poor nutrition and hydration.

 

Methodist objected to the sufficiency of Dr. Hammond=s report as being Awholly conclusory
as to any causative link between the alleged negligence of each respective
hospital and [Taylor=s] adverse outcome,@ and Awholly devoid of
any opinion linking [Methodist=s] conduct to [Taylor=s] death.@  Methodist also
argued Dr. Hammond was not qualified to give an opinion on causation, stating, ASpecifically, Dr.
Hammond has no particular training, qualifications or experience in wound
care.  He is merely an internist and nephrologist . . . .@








Triumph objected to the sufficiency of Dr. Hammond=s report, arguing,
A[T]he report is
conclusory as to the element of causation.  In addition, the expert report
prepared by Dr. Hammond fails to explain how the alleged negligence of
Defendant was a but for or proximate cause of the damages claimed by Plaintiff.@  Triumph also
argued Dr. Hammond was not qualified, under Texas Practice and Remedies Code
section 74.402(b)(2), to give an opinion regarding the accepted standards of
care for wound care because he was not actively practicing wound care at the
time of the events in question or at the time he gave his opinions.

The trial court heard Methodist=s and Triumph=s objections and
found Dr. Hammond qualified.  Methodist and Triumph then orally moved to
dismiss the case.[5] 
By written order entered the same day, the trial court denied Methodist=s and Triumph=s objections and
motions to dismiss.  Methodist and Triumph filed separate notices of appeal and
have filed separate appellate briefs.[6]


II.  Issues Presented and
Standard of Review

In its sole issue, Methodist argues the trial court abused
its discretion by denying its motion to dismiss.  Likewise, Triumph, in its
sole issue, argues the trial court abused its discretion by overruling its
objection to the adequacy of Dr. Hammond=s expert report
and denying its motion to dismiss.  In the trial court, both hospitals
challenged Dr. Hammond=s qualifications and the sufficiency of
his report on the element of causation.[7] 
Bennett, as the proponent of the expert, had the burden to show that the expert
was qualified and the expert report satisfied the statutory requirements.  Mem=l Hermann
Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).








We review a trial court=s decision
regarding the adequacy of an expert report and its  decision on a defendant=s motion to
dismiss under an abuse-of-discretion standard.  See Am. Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001) (construing
former statute).  We apply the same standard to a trial court=s determination
that an expert is qualified.  See Broders v. Heise, 924 S.W.2d 148, 151B52 (Tex. 1996).  A
trial court abuses its discretion if it acts in an arbitrary or unreasonable
manner without reference to any guiding rules or principles.  Bowie Mem=l Hosp. v. Wright, 79 S.W.3d 48, 52
(Tex. 2002) (per curiam).

We may not reverse a trial court=s discretionary
ruling simply because we might have decided it differently.  See Walker v.
Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003) (construing former statute).[8] 
A trial court, however, has no discretion in determining what the law is or
applying the law to the facts; therefore, a trial court=s failure to apply
or analyze the law correctly is an abuse of discretion.  Sanjar v. Turner,
No. 14-07-00545-CV, CS.W.3dC, C, 2008 WL 441817,
at *2 (Tex. App.CHouston [14th Dist.] Feb. 19, 2008, no
pet.).

III.  Analysis

A. 
Is Dr. Hammond qualified to render an opinion on the standard of care?








Triumph asserts Dr. Hammond is not qualified to render an
opinion on the standard of care.[9] 
In the trial court, Triumph argued Dr. Hammond is Anot qualified to
render opinions regarding the medical issues specific to this case, wound care.@  On appeal,
Triumph expands this argument and contends Dr. Hammond is not qualified to
render an opinion on the standard of wound care by professional nurses. 
Assuming, without deciding, Triumph, in its trial argument, sufficiently
preserved the argument it makes on appeal, we disagree.

The Texas Legislature, in Texas Civil Practice and Remedies
Code section 74.402,  has specified requirements for qualifying a person as an
expert witness in a suit against a health care provider:

In a suit involving a health care liability claim
against a health care provider, a person may qualify as an expert witness on
the issue of whether the health care provider departed from accepted standards
of care only if the person:

(1) is practicing health care in a field of practice
that involves the same type of care or treatment as that delivered by the
defendant health care provider, if the defendant health care provider is an
individual, at the time the testimony is given or was practicing that type of
health care at the time the claim arose;

(2) has knowledge of accepted standards of care for
health care providers for the diagnosis, care, or treatment of the illness,
injury, or condition involved in the claim;  and

(3) is qualified on the basis of training or
experience to offer an expert opinion regarding those accepted standards of
health care.

(c) In determining whether a witness is qualified on
the basis of training or experience, the court shall consider whether, at the
time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or
more states of the United States or a national professional certifying agency,
or has other substantial training or experience, in the area of health care
relevant to the claim; and

(2) is actively practicing health care in rendering
health care services relevant to the claim.








 

Tex. Civ. Prac. & Rem. Code Ann. ' 74.402(b), (c)
(Vernon 2005).[10] 
Our analysis of the qualifications of an expert is limited to the four corners
of the expert=s report and curriculum vitae.  See Burrell,
230 S.W.3d at 758 (regarding analysis of qualifications under section 74.351,
which, in turn, contains a reference to section 74.402).

 In his report, Dr. Hammond stated he was practicing
medicine at all times relevant to the claims made in the case and was actively
practicing at the time of his opinion. He is board certified in internal
medicine and had been board certified in nephrology from 1996 to 2006, i.e.,
a period overlapping the time Taylor=s injury allegedly
occurred.  Dr. Hammond stated that the two certifications Adirectly address
the subject matter of this claim, as the claim relates to management of
decubitus ulcers.@  Dr. Hammond indicated, because he had
either trained, served as a consultant to, or observed health care providers in
the same fields as the defendants, he has knowledge of the accepted standards
of medical care for the diagnosis, care, and treatment related to the prevention
and management of decubitus ulcers.  He further stated he is Afamiliar with the
standard of care for both nurses and physicians for the prevention and
treatment of decubitus ulcers.@  Finally, Dr. Hammond explained, AI give direct care
to patients with decubitus ulcers and was doing so at all times relevant to
this case.  As such, I am also familiar with the consequences of improper management
of decubitus ulcers that is not within the standard of care.@








Dr. Hammond=s statement of his qualifications compares
favorably to that held sufficient in Burrell in the face of a challenge
to the expert=s qualifications under subsections 74.402(b)(2) and
(3).  Burrell, 230 S.W.3d at 759.  In that case, the expert described
his qualifications as follows:

I completed a fellowship in infectious disease and have practiced for
over 25 years in infectious disease.  I am a frequent speaker at various
regional and national medical conferences and have been a consultant for the
Massachusetts Department of Health.  I have reviewed various medical records
concerning Katie Whitfield and I am familiar with the standard of care as it
pertains to prevention and treatment of decubitus ulcers.  I have experience in
instructing nurses and other personnel in the proper techniques to prevent
decubitus ulcers and I have treated patients with decubitus ulcers over the
course of my practice as an infectious disease, internist and occupational
doctor.

 

Id. at 763.[11] 
See also Group v. Vicento, 164 S.W.3d 724, 734 (Tex. App.CHouston [14th
Dist.] 2005, pet. denied) (holding anesthesiologist, who used same pain
management modalities as do chiropractors was Apracticing health
care@ in a field of
practice that involved same type of care as chiropractor, thus satisfying
subsection 74.402(b)(1), and doctor=s statement he had
knowledge of accepted standard of care for injury or illness at issue satisfied
section 74.402(b)(2)).








Triumph, however, argues that Dr. Hammond is not qualified
to establish the standard of care for professional nurses.  In support, it
relies primarily on the majority opinion in Simonson v. Keppard, 225
S.W.3d 868 (Tex. App.CDallas 2007, no pet.), a case in which the
Fifth Court of Appeals concluded that the trial court abused its discretion
when it denied a nurse practitioner=s motion to
dismiss.  Id. at 874.  In the motion, the nurse had argued that the
expert report was inadequate because the expert doctor was not qualified to
give an opinion on the standard of care for a nurse practitioner.  Id. 
The Simonson majority observed that A[n]owhere in his
affidavit does Dr. Thomas state that he either has knowledge of the standard of
care applicable to nurse practitioners or that he has ever worked with or
supervised nurse practitioners.@  Id. at 872.  In contrast, in the
present case Dr. Hammond specifically stated, AI am familiar with
the standard of care for both nurses and physicians for the prevention and
treatment of decubitus ulcers.@  Thus, Simonson is
distinguishable.

Moreover, in reaching its conclusion, the Simonson
majority relied on Cox v. Vanguard Health Systems, Inc., No. 04‑04‑00762‑CV,
2005 WL 2367582 (Tex. App.CSan Antonio, Sept. 28, 2005, pet. denied)
(mem. op.) and Jones v. Ark‑La‑Tex Visiting Nurses, 128
S.W.3d 393 (Tex. App.CTexarkana 2004, no pet.).[12] 
In holding the experts were not qualified in those cases, the appellate courts
were affirming the trial courts= discretionary decisions.  Additionally,
as the Simonson dissent observes,

Those cases were decided under section 74.402(b)=s predecessor, which defined Aexpert@ opining about non‑physician
health care providers as having Aknowledge of accepted standards of care for the diagnosis,
care, or treatment of the illness, injury, or condition involved in the claim.@ Current section 74.402(b)(1) added
language requiring experts opining about Ahealth care providers@ to be practicing health care in a Afield of practice that involves the
same type@ of care.  This may explain a
different emphasis by these courts on a specific category of caregiver.

 

Simonson, 225 S.W.3d at
883 (O=Neill, J.,
dissenting) (footnote omitted).

Given the difference between the expert report in Simonson
and the one under consideration in the present case and given the case law on
which Simonson relies, we decline to follow Simonson.  We
overrule Triumph=s issue to the extent Triumph challenges
the expert=s qualifications.

B. 
Is Dr. Hammond=s report sufficient on the element
of causation?








Both Methodist and Triumph argue that Dr. Hammond, in his
report, does not sufficiently address the relationship between the alleged
breaches of the standard of care and Taylor=s alleged injury.[13] 
Methodist argues that in the report Dr. Hammond completely fails to address how
Methodist=s actions allegedly caused Taylor=s death and
further argues the description of the causal relationship between Methodist=s alleged breaches
of the standard of care and Taylor=s damages is
wholly conclusory, and that Dr. Hammond fails to identify the mechanism of
injury.  Triumph argues Dr. Hammond=s opinions are
illogical, speculative, and conclusory.[14]

Under Texas Civil Practice and Remedies Code section
74.351(r)(6),

AExpert report@ means a written report by an expert that provides a fair
summary of the expert=s opinions as of the date of the
report regarding applicable standards of care, the manner in which the care
rendered by the physician or health care provider failed to meet the standards,
and the causal relationship between that failure and the injury, harm, or
damages claimed.

 

Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(6)
(Vernon Supp. 2007).  AA court shall grant a motion challenging
the adequacy of an expert report only if it appears to the court, after
hearing, that the report does not represent an objective good faith effort to
comply with the definition of an expert report in Subsection (r)(6).@  Id. ' 74.351(l).








Thus, when a trial court considers a motion to dismiss
under section 74.351(l), the issue Ais whether >the report= represents a
good-faith effort to comply with the statutory definition of an expert report.@  Wright,
79 S.W.3d at 52 (construing former statute and quoting Palacios, 46
S.W.3d at 878).  To constitute a Agood-faith effort,@ the report must,
for each defendant, provide a fair summary of the expert=s opinions about
the applicable standard of care, the manner in which the care failed to meet
that standard, and the causal relationship between that failure and the injury,
harm, or damages claimed.  Palacios, 46 S.W.3d at 878. The report must
provide enough information to fulfill two purposes: (1) to inform the defendant
of the specific conduct the plaintiff has called into question and (2) to
provide a basis for the trial court to conclude that the claims have merit.  Id.
at 879.  Under Palacios, the only information relevant to the inquiry is
the information contained within the four corners of the document.  Id.
at 878.  Finally, in the report the plaintiff need not marshal all of her
proof, but must include the expert=s opinion on each
of the three elements the statute identifies:  (1) standard of care, (2)
breach, and (3) causal relationship.  Id.  








Wrongful death claim.  Methodist argues Dr. Hammond
completely failed to address how Methodist=s actions caused
Taylor=s death.  Bennett
concedes Dr. Hammond did not provide an opinion on the cause of Taylor=s death.  However,
Bennett repeatedly asserts that he is not making a claim for Taylor=s wrongful death. 
Unlike his prior pleadings, Bennett=s second amended
petition (the live pleading at the time the trial court entered the orders at
issue), does not contain a citation to the wrongful death statute and does not
contain damage allegations related to Taylor=s death.  We
conclude Bennett is not pursuing a wrongful death claim and that he is not
claiming damages based on Taylor=s death. 
Therefore, the lack of opinion on the cause of Taylor=s death is not
relevant to the sufficiency of the report in stating Dr. Hammond=s opinions about
the causal relationship between the failure to meet the applicable standard of
care and the injury, harm, or damages claimed. Cf. Alexander v.
Terrell, No. 09-07‑00198-CV, 2007 WL 2683536, at *1, *4 (Tex. App.CBeaumont, Sept.
13, 2007, no pet.) (mem. op.) (concluding trial court did not abuse discretion
in denying defendant=s motion to dismiss survival claims
regarding alleged negligence in failing to monitor skin condition, even though
report was inadequate to support wrongful death claim).[15]

Other injuries.  The injuries at issue are the alleged
formation and worsening of Taylor=s decubitus
ulcers.  Methodist argues that Dr. Hammond=s report is
conclusory because in it Dr. Hammond fails to explain the mechanism of injury,
that is, how the alleged breach caused Taylor=s ulcer.  Triumph
argues Dr. Hammond=s report is inaccurate and illogical
because, although Dr. Hammond reports Taylor had an ulcer when she was admitted
to Triumph, Dr. Hammond charges Triumph with causing formation of the ulcer. 
Triumph also faults Dr. Hammond for not specifying how each defendant=s conduct caused
the injury and for not explaining how, absent the alleged breaches, Taylor=s outcome would
have been different.

In two separate paragraphs, Dr. Hammond assigned identical
standards of care to both Methodist and Triumph.  In two separate paragraphs
dealing with breaches of the standard of care, he stated the following
regarding each hospital:

The staff .
. . , by not optimizing the patient=s
nutrition and hydration caused the formation of decubitus ulcers.  Furthermore,
the staff . . . breached the standard of care by failing to perform ongoing
assessment, reassessment and care planning to prevent, detect, and manage
decubitus ulcers, and treatable predisposing factors such as poor nutrition and
hydration breaches of the standard of care were the proximate cause of Ms.
Taylor=s decubitus formation and failure to heal a decubitus,
together with poor nutrition and poor hydration.

 








Thus, in the preceding paragraph Dr. Hammond set forth two
causal links.  First, he linked each staff=s alleged failure
to prevent, detect, and manage Taylor=s nutrition and
hydration (as examples of treatable predisposing factors) to the ulcers= formation and
failure to heal.  Second, he linked each staff=s alleged failure
to prevent, detect, and manage the ulcers to the ulcers= failure to heal. 
Dr. Hammond also stated:

By failing
to perform an initial survey of skin integrity, assessment for risk for ulcers
with a scale such as the Braden scale, and following up with skin care nursing
and protocol interventions when decubitus ulcers were detected, as well as
failing to optimize the patient=s nutrition and
hydration to prevent formation of new ulcers and enhance healing of existing ulcers
as well as failing to perform ongoing assessment, reassessment and care
planning to prevent, detect, and manage decubitus ulcers, and treatable
predisposing factors such as poor nutrition and hydration. [sic]  The staff . .
. allowed the patient to develop decubitus formation and further promoted
failure to heal through poor nutrition and poor hydration.

 

In the preceding paragraph, Dr. Hammond thus added an
additional causal link.  He linked each staff=s failure to
perform an initial survey of skin integrity and assessment for risk of ulcers
to Taylor=s development of ulcers.

Finally, in two separate paragraphs, Dr. Hammond stated
with regard to each hospital staff:

Had the standard of care been met by the staff . . . as outlined above,
the specific outcome, based upon reasonable medical probability, would have
been prevention and healing of decubitus formation, and maintenance of good
nutrition and hydration.

 








In response to Methodist=s argument, we
conclude Dr. Hammond=s report sets forth the mechanism of
Taylor=s injury,
specifically (1) failure to provide adequate initial skin assessment,
hydration, and nutrition led to the formation of ulcers, and (2) failure to
provide skin care nursing and protocol interventions when decubitus ulcers were
detected, as well as failing to optimize Taylor=s nutrition and
hydration led to formation of new ulcers and prevented healing of existing
ulcers.  Regarding Triumph=s contention that Dr. Hammond=s report was
inaccurate and illogical, we conclude the trial court reasonably could have
concluded otherwise in light of Dr. Hammond=s references both
to an Aulcer@ and to Aulcers@ and his reference
to the formation of new ulcers, thus admitting of the possibility that Taylor
arrived at Triumph with an ulcer and additional ulceration occurred while she
was there.

Although Dr. Hammond=s opinion for each
defendant is identical, he unquestionably provided an opinion for each
hospital.  That he held each defendant to the same standard of care, found the
same type of breach, and analyzed causation in the same way does not render his
opinion inadequate.  See Sanjar, 2008 WL 441817, at *5 (stating, Anothing in Taylor
[v. Christus Spohn Health Sys. Corp., 169 S.W.3d 241, 244 (Tex. App.CCorpus Christi
2004, no pet.),] explicitly forbids applying the same standard of care to more
than one physician if, as in the present case, they all owed the same duty to
the patient@ and further holding report sufficient on causation); see
also Packard v. Guerra, No. 14-06-00546-CV, CS.W.3dC, C, 2008 WL 516560,
at *14 (Tex. App.CHouston [14th Dist.] Feb. 29, 2008, no
pet. h.) (rejecting contention that expert reports were insufficient because
experts assigned defendants the same duties and obligations).

Finally, Dr. Hammond indicated, with regard to each
defendant, that if each hospital had followed the appropriate standard of care,
Taylor would have maintained good nutrition and hydration, ulcer formation
would have been prevented, and those ulcers already present would have healed. 
Although Dr. Hammond=s report could have been more specific, we
cannot say the trial court=s conclusion that it was sufficient
constituted an abuse of discretion.  See Sanjar, 2008 WL 441817, at *5.[16]








The majority of the cases on which Methodist and Triumph
rely are appeals from dismissals of health care liability
claims.  The appellate courts, in holding the experts= reports were
insufficient in those cases, were affirming the trial court=s exercise of
discretion.  In contrast, the present case is an appeal from the trial court=s denial of a
motion for dismissal.  Accordingly, we question the usefulness of Methodist=s and Triumph=s cited cases in
analyzing the present one.

We consider Gallardo v. Ugarde, more instructive. 
145 S.W.3d 272 (Tex. App.CEl Paso 2004, pet. denied).  In that case,
the appellate court reversed a trial court order finding the expert report
deficient and dismissing the case.  Id. at 274.  The Gallardo court
concluded the report was sufficient, despite the trial court=s conclusion to
the contrary.  Significantly, on the element of causation, the report in Gallardo
compares favorably to the report in the present case.

The Gallardo court summarized the relevant part of
the report addressing decubitus ulcers as follows:

Regarding decubitus ulcers, the report states that
Gallardo had a stage II decubitus ulcer on his right hip on and off from
January to April 1999.  By May 1999, the decubitus progressed to stage IV and
eventually developed into cellulitis, requiring in‑patient management
with intravenous antibiotics and Asurgical debridement with flap.@  From May 3 to mid‑June, the
treatment was not changed although the wound was clearly getting worse.  The
report further states:








On March 1, 1999,
the Treatment Nurse recommended a water mattress.  The records do not reflect
that Mr. Gallardo received a water mattress or any other type of off loading
mattress.  There are comments on the CDR noting that this (right hip decubitus)
is a recurring problem and that resident favors his right side.  However,
neither Dr. Ugarte nor the Treatment Nurse address preventative measures except
for recommending a water mattress which Mr. Gallardo did not get.  Nor did he
receive any other type of off loading mattress.  More frequent checks by the
CNA to insure he maintained a position change every two hours, padding his bed
in such a manner as to maintain him in position and Granulex spray to pressure
points are but a few of the things that . . . could have been done to prevent
as well as treat the decubitus.  There is no evidence in the record that Mr.
Gallardo received any of these preventive measures.

The report indicates that Sunset=s nurses did not always inform
Ugarte of changes in Gallardo=s condition, including changes related to decubitus.  But the report
also indicates that Ugarte saw Gallardo during the period that he had the
decubitus, although it is not clear how often Ugarte saw him.  The report states
that a nurse consulted with Ugarte regarding decubitus on July 5.  The next
day, Ugarte saw Gallardo and admitted him to the hospital for the problem.
Ugarte=s progress notes for that day
contain his first mention of decubitus.

 

Id. at 278B78 (footnote
omitted).

In analyzing the sufficiency of the report in relation to
decubitus ulcers, the Gallardo court addressed causation in the
following context:

We conclude that the report represents a good‑faith
effort to provide a fair summary of Kirk=s [the expert=s] opinions.  Regarding decubitus ulcers, the report states
that more frequent checking by the CNA to insure that Gallardo maintained a
position change every two hours, padding his bed, and applying Granulex spray Aare but a few of the things that .
. . could have been done to prevent as well as treat the decubitus. There is no
evidence in the record that Mr. Gallardo received any of these preventive
measures.@  This statement explains the
standard of care by listing the steps that could have been taken and explains
how the standard of care was breached by noting that none of the steps were
taken.  Thus, the statement specifically addresses what care was expected but
not given.  The statement addresses causation by indicating that if the
proper steps had been taken, the decubitus could have been prevented or at
least could have been prevented from progressing to stage IV. Although the
statement does not use the word Acausation,@ the words Acould have been done to prevent as
well as treat the decubitus@ adequately convey the idea that failure to take the
proper steps caused the decubitus or caused it to get worse.   Moreover, the report indicates
that Ugarte undertook to treat Gallardo for the decubitus and Kirk expressly
faults him for not ordering the proper steps to be taken.

 

Id. at 279B80) (emphasis
added) (citations omitted).








If the expert providing the report in Gallardo
addressed causation well enough that the appellate court could hold the trial
court abused its discretion in finding the report inadequate and dismiss the
case, certainly Dr. Hammond=s treatment of the issue in his report is
sufficient to enable this court to conclude that the trial court in the present
case did not abuse its discretion in overruling the hospitals= objections and
denying their motions to dismiss.

IV.  Conclusion

The trial court did not abuse its
discretion in overruling Methodist=s and Triumph=s objections to Dr. Hammond=s report and in denying their motions to dismiss. 
We therefore affirm the orders of the trial court.

 

 

 

/s/      Kem Thompson Frost

Justice

 

Judgment rendered
and Opinion filed May 29, 2008.

Panel consists of
Chief Justice Hedges and Justices Frost and Murphy.*

 









[1]  Tex. Civ.
Prac. & Rem. Code Ann. '
71.001B.022 (Vernon 1997 & Supp. 2007).





[2]  Nephrology is Athe
science that deals with the kidneys, esp. their structure, functions, or
diseases.@  Webster=s
Third New International Dictionary 1517
(1993).





[3]  Pseudomonas is a genus of
bacteria.  See id. at 1831.





[4]  An Aintegument@ refers to something that covers or encloses, see
id. at 1174, in this case, the skin.





[5]  Tex. Civ.
Prac. & Rem. Code Ann. '
74.351(b)(2), (c), (l) (Vernon Supp. 2007).





[6]  See Tex.
Civ. Prac. & Rem. Code Ann. '
51.014(a)(9) (Vernon Supp. 2007); Lewis v. Funderburk, 51 Tex. Sup. Ct.
J. 747, 748B49, 2008 WL 1147188, at *2 (Tex. Apr. 11, 2008).





[7]  On appeal, Methodist does not challenge Dr. Hammond=s qualifications, but challenges the sufficiency of
the report on standard of care.  Even given the most generous reading,
Methodist=s trial court objection and argument lack an objection
to the sufficiency of Dr. Hammond=s
report on standard of care; the only objection Methodist voiced was to Dr.
Hammond=s qualifications to give an opinion on standard of
care.





[8]  In the context of a mandamus proceeding, the Texas
Supreme Court explained:

 

With respect to resolution of factual issues or
matters committed to the trial court=s
discretion . . . the reviewing court may not substitute its judgment for that
of the trial court.  The relator must establish that the trial court could
reasonably have reached only one decision.  Even if the reviewing court
would have decided the issue differently, it cannot disturb the trial court=s decision unless it is shown to be arbitrary and
unreasonable.

 

Walker v. Packer, 827 S.W.2d 833, 839B40 (Tex. 1992)
(emphasis added) (citations omitted).





[9]  In the trial court, Methodist challenged Dr. Hammond=s qualifications to render an opinion on the question
of causation because he allegedly had Ano
particular training, qualifications or experience in wound care.@  On appeal, Methodist does not challenge Dr. Hammond=s qualifications on either causation or standard of
care.





[10]  For purposes of section 74.402, A>practicing health care= includes: (1) training health care providers in the same
field as the defendant health care provider at an accredited educational
institution; or (2) serving as a consulting health care provider and being
licensed, certified, or registered in the same field as the defendant health
care provider.@  Tex.
Civ. Prac. & Rem. Code Ann. ' 74.402(a) (Vernon 2005).  AIncludes@ is
a term of enlargement, not limitation, and therefore these two definitions are
not exclusive.   Group v. Vicento, 164 S.W.3d 724, 731 (Tex.  App.CHouston [14th Dist.] 2005, pet. denied).





[11]  We acknowledge, in analyzing the expert=s qualifications, the Burrell court referred to
the Aclear, fact‑based explanations of the standards
of care@ section of that report.  Burrell, 230 S.W.3d
at 760.  We also acknowledge the standard-of-care section in the report in the
present case does not contain the same degree of detail as the report in Burrell. 
Nevertheless, comparable to the expert in Burrell, Dr. Hammond
specifically stated he has given direct patient care to patients with decubitus
ulcers.





[12]  Triumph also cites Cox and Jones in
support of its argument.





[13]  Additionally, Methodist argues Dr. Hammond did not
properly define the standard of care.  Methodist, however, did not present this
argument to the trial court.  See note 6, supra.  Methodist
therefore has not preserved this complaint for appellate review.  See
Tex. R. App. P. 33.1(a); see also Ellis v. McKinney, No. 01-00-01098-CV,
2001 WL 1445892, at *3 (Tex. App.CHouston
[1st Dist.] Nov. 15, 2001, pet. denied)  (not designated for publication) (A[A] trial judge does not abuse his discretion for not
considering grounds that were not presented to him.@).





[14]  Triumph also argues Dr. Hammond ignored facts
documented in the medical record.  To support this argument, Triumph refers to
documents, attached to its brief, which are not part of the appellate record
and information outside the four corners of the report.  We cannot consider
this documentation.  See Cherqui v. Westheimer Street Festival Corp.,
116 S.W.3d 337, 342 n. 2 (Tex. App.CHouston
[14th Dist.] 2003, no pet.) (A[W]e cannot
consider documents attached as appendices to briefs and must consider a case
based upon the record filed.@);  Palacios,
46 S.W.3d at 878 (A[T]he only information relevant to the inquiry [of
whether the report represents a good faith effort to comply with the statute]
is within the four corners of the document.@).  Thus, Triumph cannot prevail on this argument.





[15]  Having successfully represented to this court that
he is not seeking recovery on a wrongful death claim, Bennett cannot take a
contradictory position in subsequent proceedings.  See Charles Brown, L.L.P.
v. Lanier Worldwide, Inc., 124 S.W.3d 883, 899B900 (Tex. App.CHouston
[14th Dist.] 2004, no pet.) (discussing judicial estoppel and judicial
admission).





[16]  As an example of a more specific report in a case
involving decubitus ulcers, see Alexander, 2007 WL 2683536, at *2;
Agana v. Terrell, No. 09-07‑00088-CV, 2007 WL 1793786, at *1, *2
(Tex. App.CBeaumont, June 21, 2007, no pet.) (mem. op.)





*  Senior Chief Justice Paul Murphy sitting by assignment.