Opinion issued July 25, 2013



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-12-00658-CV

———————————————

**SELECT SPECIALTY HOSPITAL-HOUSTON LIMITED PARTNERSHIP D/B/A SELECT SPECIALTY HOSPITAL HOUSTON WEST, Appellant**

**V.**

**KEITH SIMMONS AND KIRK SIMMONS, Appellees**

---

**On Appeal from the 125th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-02433**

---

## MEMORANDUM OPINION

This is an interlocutory appeal from the denial of appellant's motion to dismiss appellees' claims under Chapter 74 of the Texas Civil Practice and Remedies Code. We affirm.

## BACKGROUND

Plaintiffs/appellees Keith Simmons and Kirk Simmons (Plaintiffs) are the children of Willie Lee Simmons (Simmons), who is now deceased. Plaintiffs sued defendant/appellant Select Specialty Hospital-Houston Limited Partnership d/b/a Select Specialty Hospital Houston West (Select Specialty) complaining of its nurses' medical care of Simmons before his death. Plaintiffs served two medical expert reports, one by Cheryall Sparks, RN and one by Sheila Chachere, MD. Select Specialty filed objections to the reports and a motion to dismiss. The trial court denied the motion, and Select Specialty filed this interlocutory appeal.

### A. Plaintiffs' Allegations

The following facts are taken from Sparks's and Chachere's expert reports.[1] Simmons, a 69-year-old man, was transferred from Memorial Hermann City Medical Center to Select Specialty on July 15, 2011. Select Specialty's admission database reflected a diagnosis of "Respiratory Failure, Deconditioning, Pulmonary Fibrosis, SOB, ARDS, and Malnutrition." According to the Nurse Progress Notes, Simmons "arrived alert, on a ventilator, and with a trachcostomy, IV, foley, and feeding tube."

---

[1] Throughout its brief, Select Specialty challenges the accuracy of the statements in Sparks's and Chachere's reports. For purposes of our review of the adequacy of a medical expert report under Chapter 74, however, we take the allegations in the report as true. *Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

Sparks's report states that, when Simmons arrived at Select Specialty, there was "no documentation of any skin breakdowns, wounds, redness, or discoloration anywhere on his body." Select Hospital's records reflect that Simmons was rated as a high risk for bedsores. On August 12, 2011, he was found unresponsive by a nurse. On September 15, 2011, and again on September 19, 2011, he experienced a low heart rate and blood pressure. He died later on September 19, 2011.

Sparks's report contains the following synopsis of the nurses' documentation of treatment of Simmons's bed sores:

> On July 16, 2011, one day after Mr. Simmons' admission to Select Specialty, the nurses first documented that Mr. Simmons had a Stage II wound on his sacrum. A Stage II wound is a wound that shows openings in the skin. Stage II wounds are characterized by the partial loss of the 1st and 2nd layers of skin. Stage II wounds are shallow with a red or pink ulcer bed. On July 17, 2011, the nurses also reported that Mr. Simmons had left and right buttock skin wounds with light drainage and no odor. As a result, the nurses reported that Mr. Simmons' dressing was to be changed daily per orders. On July 17, 2011 the nurses applied a santyl dressing to Mr. Simmons' left and right buttock skin wounds. A santyl dressing is a collagenase enzyme used to help heal burns and skin ulcers, which are skin wounds. In normal practice, santyl is applied daily.
>
> On July 23 and 24, 2011, Mr. Simmons was not repositioned every 2 hours. In addition, the nurses did not document dressing changes for July 24, 2011. On August 1, 2011, the nurses documented that Mr. Simmons developed an inner gluteal fold skin wound. On August 2, 2011, the nurses applied a hydrocolloid dressing to Mr. Simmons' inner gluteal fold skin wound. A hydrocolloid dressing is an adhesive wafer applied to skin ulcers, which can be changed every 3-5 days.
>
> On August 3, 7, and 9, 2011, the nurses did not reposition Mr. Simmons every 2 hours and documented no dressing changes. On

3

August 6, 2011, Mr. Simmons developed a Stage II inner thigh skin wound. No dressing changes were documented at the report of this Stage II wound. On August 10, 2011, the nurses reported that Mr. Simmons was incontinent of urine. Incontinent of urine means that Mr. Simmons was incapable of controlling his urinary functions. On August 20, 2011, the nurses reported that Mr. Simmons was incontinent of feces. Incontinent of feces means that Mr. Simmons was incapable of controlling his bowel functions. From then, there are documentations stating that the nurses dressed Mr. Simmons' skin wounds, including his pressure ulcers, occasionally. As the days progressed, Mr. Simmons' skin wounds, including his pressure ulcers, became multiple in numbers.

Sparks's report alleges that Select Specialty's nurses breached the applicable standard of care in several respects related to the prevention and treatment of bedsores. Specifically, they (1) failed to treat Mr. Simmons's skin wounds with santyl dressing on a daily basis between July 15, 2011 and August 1, 2011 (despite doctor's orders to do so and despite daily changing santyl dressings being the "normal practices"), (2) failed to correctly administer hydrocolloid dressings between August 1, 2011 and September 19, 2011, and (3) failed to correctly reposition Mr. Simmons to address his development of bed sores.

Chachere's report was based upon a review of Sparks's report, and opined that Select Specialty's breaches of the standard of care caused Simmons's bedsores.

**B.    Select Specialty's Motion to Dismiss**

Select Specialty filed a motion to dismiss, asserting that Sparks and Chachere were not qualified to render their opinions, and that their reports were

4

otherwise deficient. The trial court denied Select Specialty's motion, and it brought this appeal.

## ISSUES ON APPEAL

Select Specialty brings two issues on appeal:

1. "[T]he trial court abused its discretion when it overruled Appellant's Objections and denied Appellant's Motion to Dismiss because Cheryall Y. Sparks, R.N. and Sheila L. Chachere, M.D. are not qualified to address issues of standard of care, breach and causation as to Select Specialty."

2. "[T]he trial court abused its discretion when it overruled Appellant's Objections and denied Appellant's Motion to Dismiss because the expert reports of Cheryall Y. Sparks, R.N. and Sheila L. Chachere, M.D. do not adequately address the issues of standard of care, breach and causation as to Select Specialty Hospital."

## APPLICABLE LAW

### A. Standard of Review

We review a trial court's ruling on a motion to dismiss for lack of an adequate medical report for an abuse of discretion. *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006) (citing *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996)); *Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 220 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Lookshin v. Feldman*, 127 S.W.3d 100, 103 (Tex. App.—Houston [1st Dist.]

5

2003, pet. denied). We do not disturb the trial court's discretion absent clear abuse. *Larson*, 197 S.W.3d at 304 (citing *Broders*, 924 S.W.2d at 151).

## B.    Chapter 74 Expert Report Requirements

Section 74.351 serves as a 'gate-keeper' through which no medical negligence causes of action may proceed until the claimant has made a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *See* TEX CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon 2011); *Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005). A report need not marshal all of the plaintiff's proof, but it must include the expert's opinions on the three statutory elements: standard of care, breach, and causation. *See Am. Transitional Care Ctrs. Of Tex. Inc. v. Palacios*, 46 S.W.3d 873, 878, 880 (Tex. 2001); *Spitzer v. Berry*, 247 S.W.3d 747, 750 (Tex. App.—Tyler 2008, pet. denied) (quoting *Palacios,* 46 S.W.3d at 880) (stating "fair summary" is "something less than a full statement" of applicable standard of care, how it was breached, and how that breach caused injury).

To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. A report that merely states the expert's conclusions as to the standard of care, breach, and

6

causation does not fulfill these two purposes. *Id*. The expert must explain the basis

for his statements and link his conclusions to the facts. *Bowie Mem'l Hosp. v.*

*Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Earle v. Ratliff*, 998 S.W.2d 882, 890

(Tex. 1999)). The trial court may not draw any inferences, but must rely

exclusively on the information contained within the report's four corners. *See*

*Palacios*, 46 S.W.3d at 878.

In addition to setting forth the requisite criteria, a Chapter 74 report must be

authored by a qualified "expert." TEX. CIV. PRAC. & REM. CODE ANN. §

74.351(r)(6). The standards governing qualifications of an expert report in support

of a claim against a non-physician defendant are set forth in section 74.402.

§ 74.402. Qualifications of Expert Witness in Suit Against Health
Care Provider

(a)    For purposes of this section, "practicing health care" includes:

(1)    training health care providers in the same field as the
defendant health care provider at an accredited educational
institution; or

(2) serving as a consulting health care provider and being
licensed, certified, or registered in the same field as the
defendant health care provider.

(b)    In a suit involving a health care liability claim against a health
care provider, a person may qualify as an expert witness on the issue of
whether the health care provider departed from accepted standards of care
only if the person:

(1)    is practicing health care in a field of practice that
involves the same type of care or treatment as that delivered by
the defendant health care provider, if the defendant health care

7

provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402.

## QUALIFICATIONS

In its first issue, Select Specialty argues that "neither Nurse Sparks nor Dr. Chachere are qualified to render opinions against Select Specialty." According to Select Specialty, Simmons's "grave medical conditions" upon his admittance to Select Specialty, "are significant in determining whether Nurse Sparks, an obstetrics nurse, and/or Dr. Chachere, a pediatrician, are qualified to offer expert opinions as to this patient and the care this patient received at Select Specialty."

8

As for Nurse Sparks, Select Specialty contends that she is not qualified because, while she has extensive employment history in the field of obstetrics, "nothing in her report or her curriculum vitae demonstrate that she has ever worked at a long-term acute care facility such as Select Specialty or that she has ever cared for elderly patients suffering from the significant pulmonary and cardiac conditions Mr. Simmons suffered from at the time he presented to Select Specialty." Moreover, "nothing in Nurse Sparks' report or curriculum vitae evidence any experience whatsoever in treating patients with a tracheotomy or ventilator dependence, such as Mr. Simmons, in a long term acute care facility such as Select Specialty."

Similarly, with regard to Dr. Chachere—a board certified pediatrician—Select Specialty contends that "a review of her expert report and her curriculum vitae fail to demonstrate her qualifications to offer opinions in this case." Select Specialty acknowledges that Chachere has experience treating chronically ill children, but argues that is not comparable to treatment of a chronically ill elderly person.

### A. Plaintiffs' claims

Plaintiffs' petition alleges Select Specialty's nurses were negligent in the following specific respects related to the prevention and treatment of bedsores:

a.    Failing to treat Mr, Simmons' condition properly; specifically: (i) failing to treat Mr. Simmons' skin wounds, including

9

his pressure ulcers, with santyl dressing once per day between July 15, 2011 and August 1, 2011; (ii) failing to treat Mr. Simmons' skin wounds, including his pressure ulcers, with hydrocolloid dressing every 3-5 days between August 1, 2011 and September 19, 2011; and (iii) failing to reposition Mr. Simmons every two (2) hours to alleviate his pressure ulcers.

      b.     Failing to provide the medical and nursing care reasonably required for Mr. Simmons' condition; specifically: (i) failing to treat Mr. Simmons' skin wounds, including his pressure ulcers, with santyl dressing once per day between July 15, 2011 and August 1, 2011; (ii) failing to treat Mr. Simmons' skin wounds, including his pressure ulcers, with hydrocolloid dressing every 3-5 days between August 1, 2011 and September 19, 2011; and (iii) failing to reposition Mr. Simmons every two (2) hours to alleviate his pressure ulcers.

      . . . .

      f.     Leaving Mr. Simmons unattended for up to ten (10) hours at a time; and

      g.     Failing to monitor Mr. Simmons' pressure ulcers for up to ten (10) hours at a time.

## B.    Nurse Sparks's Qualifications

Sparks's curriculum vitae reflects that she is a nurse who currently practices and teaches in the field of obstetrics, and that she currently works as a nurse consultant. She has also worked as nurse manager in the field of oncology, as well as held positions as a labor-and-delivery nurse, recovery-room nurse, clinical nurse, cardio-vascular intermediate-care nurse, urology nurse, and medical-surgery nurse.

10

Her report states that she "is currently a registered nurse in the State of Texas with over 30 years of experience," and describes her qualifications as follows:

> My nursing experience includes caring for cardiovascular, internal medicine, surgical, urology, obstetrical, oncology and radiology patients. During my nursing practice, I cared for many elderly patients and prevented, dressed, and treated skin wounds including pressure ulcers. . . .
>
> I also managed a nursing staff at Jefferson Davis Hospital and at M.D. Anderson Hospital. In that capacity, I was involved in writing patient policies and procedures for nurses. I also served on the Peer Review Committee at Kelsey Seybold Clinic for two years. While serving on the committee, I determined whether nurses fell below the standard of care for nurses.
>
> I currently consult practicing registered nurses on many subjects, including how to prevent, treat, and dress patient skin wounds, including pressure ulcers, which are the same skin wounds complained of by Mr. Willie Lee Simmons. Based upon my knowledge, skill, experience, training, and education, I am familiar with the applicable standard of care required for nurses to prevent, treat, and dress skin wounds, including pressure ulcers.

Finally, her report states that it is applicable to actions "taken or not taken by Select Specialty, by and through its registered nurses . . . . during Mr. Simmons' stay at the hospital."

The trial court did not abuse its discretion in concluding that Sparks was qualified to opine as to whether the Select Specialty's nurses departed from the accepted standards of care in preventing and treating pressure ulcers. Sparks's curriculum vitae and report reflect that she is currently practicing as a registered

11

nurse, and currently consults with practicing nurses on the prevention and treatment of pressure ulcers like those suffered by Simmons. TEX. CIV. PRAC. & REM. CODE Ann. § 74.402(b)(1), (a)(2).[2] Her report details her knowledge of the accepted standards of care and experience in treating both the complained of condition—i.e., pressure ulcers—and specifically treating them in elderly patients.

While Select Specialty correctly points out that Sparks does not profess to have experience caring for "ventilator dependent patients with co-morbidities of respiratory failure, deconditioning, pulmonary fibrosis, shortness of breath, acute respiratory distress syndrome and malnutrition at a long term acute care facility," section 74.402 of the Texas Civil Practice and Remedies Code does not require such specific experience to qualify Sparks as an expert in the prevention and treatment of pressure ulcers—the subject of Plaintiffs' claims. *See, e.g.*, *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 759 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding physician qualified to opine about standard of care for preventing bedsores based on report stating, "I am familiar with the

---

[2] Select Specialty contends that Sparks is not "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider," as required by section 74.702(b). That argument, however, does not take into account section 74.702(a), which provides "practicing health care includes . . . serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider." Nurse Sparks' curriculum vitae reflects that she is a licensed, registered nurse, and that she currently works as a nurse consultant. Her report states that she currently "consult[s] practicing registered nurses on many subjects, including how to prevent, treat, and dress patient skin wounds, including pressure ulcers, which are the same skin wounds complained of by Mr. Willie Lee Simmons."

12

standard of care as it pertains to prevention and treatment of decubitus ulcers. I have experience in instructing nurses and other personnel in the proper techniques to prevent decubitus ulcers and I have treated patients with decubitus ulcers over the course of my practice as an infectious disease internist and occupational doctor."); *Esquivel v. El Paso Healthcare Sys. Ltd*, 225 S.W.3d 83, 89–90 (Tex. App.—El Paso 2005, no pet.) (holding that professor of nursing, who also "served in various capacities at a 450-bed hospital, including assistant administrator for nursing services, acting director, director of nursing services, director of staff education, and nursing supervisor," whose report states that she was "familiar with the standard of care for skin care and prevention of decubitus ulcers as well as documentation, observation, assessment ,and intervention required," was qualified as expert as to the standard of care and breach, but not causation).

### C. Dr. Chachere's Qualifications

Chachere's curriculum vitae reflects that she currently works in the field of pediatrics, caring for "well and chronically ill children and adolescents." She has practiced and taught in the field of pediatrics in several capacities for different employers. Her report elaborates about how her current practice and experience relates to Select Specialty's treatment of Simmons:

> My medical knowledge, skill, experience, training, and education includes, but is not limited to, caring for and teaching medical students how to care for hundreds of children with chronic healthcare needs. For example, many of my chronically ill patients included

13

children with spina bifida, which means that the patient's spine failed to form correctly. Due to spina bifida, the children were highly immobile and incontinent of feces and urine. Incontinence of feces means that the children were incapable of controlling their bowel functions similar to Mr. Willie Lee Simmons' condition during his treatment by [Select Specialty] nurses. Many of my hospice patients exhibited identical conditions.

Due to my patients' medical conditions, I have to prevent, treat, and dress their skin wounds, including pressure ulcers. I also had to teach my students how to perform the same acts. Pressure ulcers, also known as decubitus ulcers, are open wounds that form whenever prolonged pressure is applied to skin covering bony outcrops of the body. Patients who are bedridden like many of my patients and Mr. Simmons are at high risk of developing pressure ulcers . . . .

Even though Mr. Simmons was a 69 year old elderly man, his injuries, namely skin wounds, including pressure ulcers, are common to and equally developed in the field of pediatrics. I also have practical knowledge of what is usually and customarily done by nurses confronted with a patient suffering from skin wounds, including pressure ulcers. As a professor at Baylor College of Medicine, I had to train nurses on how to prevent, treat, and dress patient skin wounds, including pressure ulcers, during nursing in-service.

Patients exhibiting a high risk to pressure ulcers include those who are obese, elderly; or suffering from chronic diseases, infections, injuries; or in a poor nutritional state. Many of my pediatric patients were chronically ill, which put them at a high risk for pressure ulcers similar to how Mr. Simmons was at a high risk for pressure ulcers because he was an elderly, chronically ill man. In addition, I have read medical literature, and reviewed case studies on what causes skin wounds, including skin ulcers, in both young and elderly patients.

I currently monitor and prevent skin wounds, including pressure ulcers, from developing on my patients with spina bifida and other chronic illnesses as a private practitioner at Porter Pediatrics and did so during the time that Select Specialty's nurses treated Mr. Simmons.

The trial court did not abuse its discretion in concluding that Chachere is qualified to render an opinion as to causation. Select Specialty argues that she

14

Chachere is not qualified because "[n]either her expert report nor her curriculum vitae demonstrate any experience or training whatsoever in the field of geriatrics or in caring for chronically ill elderly patients who are ventilator dependent with the same multiple co-morbidities Mr. Simmons had at the time he was a patient at Select Specialty." But her report explains that the causes and treatment of pressure ulcers in an elderly patient like Simmons are similar to the causes and treatment of chronically ill pediatric patients that she currently treats.[3] Thus, she "is practicing health care in a field of practice that involves the same type of care or treatment" as Select Specialty's nurses. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (b)(1). Her report demonstrates that she has knowledge of the acceptable standards of care for the diagnosis, care, and treatment of pressure ulcers, and that she is qualified on through experience to offer an expert opinion. TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2)–(3).

Moreover physicians with qualifications similar to Chachere's have consistently been held qualified as experts to opine on the standard of care, breach, and causation related to the prevention and treatment of pressure ulcers. For

---

[3] Her report specifically states that Simmons's injuries, namely "skin wounds, including pressure ulcers, are common to and equally developed in the field of pediatrics." *See Newman v. Graham*, 316 S.W.3d 197, 200–201 (Tex. App.— Dallas 2010, no pet.) ("A medical expert with a different specialty than the defendant physician may testify 'so long as the subject of the inquiry is common to and equally recognized and developed in both fields" (quoting *Broders*, 924 S.W.2d at 152)).

example, in *San Jacinto Methodist Hosp. v. Bennett*, the Fourteenth Court of Appeals summarized the expert physician's qualifications as follows, and affirmed the trial court's determination that the expert was qualified:

> In his report, Dr. Hammond stated he was practicing medicine at all times relevant to the claims made in the case and was actively practicing at the time of his opinion. He is board certified in internal medicine and had been board certified in nephrology from 1996 to 2006, i.e., a period overlapping the time Taylor's injury allegedly occurred. Dr. Hammond stated that the two certifications "directly address the subject matter of this claim, as the claim relates to management of decubitus ulcers." Dr. Hammond indicated, because he had either trained, served as a consultant to, or observed health care providers in the same fields as the defendants, he has knowledge of the accepted standards of medical care for the diagnosis, care, and treatment related to the prevention and management of decubitus ulcers. He further stated he is "familiar with the standard of care for both nurses and physicians for the prevention and treatment of decubitus ulcers." Finally, Dr. Hammond explained, "I give direct care to patients with decubitus ulcers and was doing so at all times relevant to this case. As such, I am also familiar with the consequences of improper management of decubitus ulcers that is not within the standard of care."

256 S.W.3d 806, 813 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In holding the physician's report sufficiently established his qualifications, the *Bennett* court noted that his statement "compares favorably to that held sufficient in *Burrell*":

> I completed a fellowship in infectious disease and have practiced for over 25 years in infectious disease. I am a frequent speaker at various regional and national medical conferences and have been a consultant for the Massachusetts Department of Health. I have reviewed various medical records concerning Katie Whitfield and I am familiar with the standard of care as it pertains to prevention and treatment of decubitus ulcers. I have experience in instructing nurses and other personnel in the proper techniques to prevent decubitus ulcers and I have treated

16

patients with decubitus ulcers over the course of my practice as an infectious disease, internist and occupational doctor.

*Id.* (quoting *Burrell*, 230 S.W.3d at 759).

Similar to the experts in *Bennett* and *Burrell*, Chachere states that she has treated patients with pressure ulcers, and instructed students how to prevent, treat, and dress pressure ulcers. She has read medical literature, and reviewed case studies on what causes skin wounds, including skin ulcers, in both young and elderly patients. At the time of Simmons's care, part of Chachere's practice was to monitor and prevent pressure ulcers from developing on patients suffering from chronic illnesses. Finally, she explains how her knowledge and experience related to pressure ulcers are applicable to patients like Mr. Simmons.

Because we conclude that the trial court did not abuse its discretion in concluding that Sparks and Chachere were qualified, we overrule appellants' first issue.

## REPORTS

In its second issue, Select Specialty contends that the "expert reports of Nurse Sparks and Dr. Chachere are insufficient on the elements of standard of care, breach and causation as to Select Specialty." Specifically, it argues that "neither Nurse Sparks nor Dr. Chachere are qualified by education, training or experience to offer opinions on the standard of care, breach or causation as to Select Specialty."

17

With regard to Sparks's report, Select Specialty relies primarily on *American Transitional Care Centers of Texas v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001) to argue that her articulation of the standard of care and breach is insufficient. In *Palacios*, the supreme court held that a single statement in an expert report "that precautions to prevent [plaintiff's] fall were not properly utilized" was not a sufficient statement of the standard of care applicable to the defendant hospital. *Id.* at 879–80. The court explained that "the standard of care for a hospital is what an ordinary prudent hospital would do under the same or similar circumstances," and that "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Id.* at 880. According to Select Specialty, Nurse Sparks' report "fares no better" because it contains only "generalized statements regarding standard of care . . . and breach."

With regard to Dr. Chachere's report, Select Specialty argues that it does not describe, with sufficient specificity, "how the alleged breach of the standard of care caused the complained of results." Rather, Select Specialty argues, Chachere's report is impermissibly conclusory.

A.    **Nurse Sparks's Report**

With regard to bedsores, Sparks's report states that she is "familiar with the applicable standard of care required for nurses to prevent, treat, and dress skin

18

wounds, including pressure ulcers." The report further states that the applicable standard of care in found in the Texas Standards of Nursing Practice, and provides in part that: (1) "A nurse shall know the rationale for and the effects of medications and treatments and shall correctly administer the same," and (2) "A nurse shall implement measures to promote a safe environment for clients and others."

Under the heading of "Breach of Standard of Care," Sparks's report discusses the standards of care for the prevention and treatment of bedsores, and opines that Select Specialty's nurses breached those standards:

> The nurses breached the standard of care applicable to nurses by failing to correctly administer santyl dressings. More specifically, the nurses failed to treat Mr Simmons' skin wounds, including his pressure ulcers, with santyle dressing on a daily basis between July 15, 2011 and August 1, 2011. In normal practice, santyle dressing is applied daily to help heal burns and skin ulcers. Further, the nurses received orders to change Mr. Simmons' santyl dressing daily and failed to do so, which a nurse of ordinary prudence would not have done under the same or similar circumstances. Since the nurses failed to treat Mr. Simmons' skin wounds, including his pressure ulcers, with santyl dressing once per day, they breached the standard of care applicable to nurses that states that a nurse shall correctly administer treatments and medications.

> In addition, the nurses breached the standard of care applicable to nurses by failing to correctly administer hydrolloid dressings. More specifically, the nurses failed to treat Mr. Simmons' skin wounds, including his pressure ulcers, with hydrocolloid dressing between August 1, 2011 and September 19, 2011. A hydrocolloid dressing an adhesive wafer applied to skin ulcers every 3-5 days, The nurses' failure to apply hydrocolloid dressing every 3-5 days to Mr. Simmons' skin wounds, including his pressure ulcers, was an act that a nurse of ordinary prudence would not have done under the same or similar circumstances. Since the nurses failed to treat Mr. Simmons'

19

skin wounds, including his pressure ulcers, with hydrocolloid dressing every 3-5 days, they breached the standard of care applicable to nurses that states that a nurse shall correctly administer treatment and medications.

Moreover, the nurses breached the standard of care applicable to nurses by failing to correctly reposition Mr. Simmons. More specifically, when Mr. Simmons arrived at Select Specialty on July 15, 2011, his Braden Scale for Predicting Pressure Sore Risk totaled 10, which placed him at a high risk for skin breakdown. On July 22, 1011, Mr. Simmons developed gluteal skin wounds. On August 1, 2011, Mr. Simmons developed an inner gluteal fold skin wound. On August 6, 2011, Mr. Simmons developed a Stage II inner thigh skin wound. On August 8, 2011, Mr. Simmons developed another gluteal fold wound. On August 9, 2011, Mr. Simmons developed a right inner thigh wound. On August 3, 7, and 9, 2011 the nurses failed to reposition Mr. Simmons every two hours, which is not what a nurse of ordinary prudence would have done under the same or similar circumstances. In addition, on August 2 and 3, 2011, the nurses decided not to reposition Mr. Simmons for up to ten (10) hours at a time. Since the nurses failed to reposition Mr. Simmons every two hours, the nurses breached the standard of care applicable to nurses to correctly administer treatment and medications.

The trial court did not abuse its discretion in concluding that Sparks's report adequately addressed the elements of standard of care and breach against Select Specialty as it relates to Simmons's development of bedsores. An expert report must "provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). "[A] fair summary must set out what care was expected, but not given, and how that caused the injury." *Spitzer v. Berry*, 247 S.W.3d at 750 (quoting *Palacios*, 46 S.W.3d at 880).

20

Unlike the one-sentence standard-of-care statement in *Palacios* "that precautions to prevent [plaintiff's] fall were not properly utilized," which the supreme court found insufficient, 46 S.W.3d at 880, Sparks's report provides a fair summary of what the Select Specialty's nurses should have done, and how they failed to meet the applicable standard. Specifically, Sparks's report specifically identifies what should have been done and what was not done in relation to (1) correctly and timely administering santyl dressing, (2) correctly and timely administering hydrocolloid dressing, and (3) timely and correctly repositioning Simmons. *E.g., Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, 382 S.W.3d 619, 629 (Tex. App.—Fort Worth 2012, no pet.) (expert reports sufficient because they "put the hospital on notice of what care [experts] opined was required but not given"); *Carrillo v. Palacios*, No. 13-08-00418-CV, 2008 WL 4981558, at *7 (Tex. App.—Corpus Christi Nov. 25, 2008, no pet.) (holding report was specific enough to put defendant on notice of what care nurses should have provided, how nurses breached standard of care, and how that breach caused decubitus ulcers, and provided the trial court with a basis to determine if claims had merit).

**B. Dr. Chachere's Report**

With regard to causation, Chachere's report provides the following opinion of how the breaches of the standard of care identified by Sparks's report contributed to Simmons's development of bedsores:

Santyl dressing is applied daily to skin wounds to help heal burns and skin ulcers. So the nurses' failure to treat Mr. Simmons' sacrum, buttocks (gluteal), and though with santyl dressing once per day between July 15, 2011 and August 1, 2011 even after being ordered to do so, more likely than not, in reasonable medical probability, directly caused skin wounds, including pressure ulcers, to develop on Mr. Simmons' sacrum, buttocks, and thigh. Santyl dressing is used to treat skin ulcers, so the nurses' failure to apply the santyl dressing to Mr. Simmons skin wounds once per day could only result in Mr. Simmons developing skin ulcers on his sacrum, buttocks, and thigh.

Hydrocolloid dressing is applied every 3-5 days to skin wounds to help heal burns and skin ulcers. As a result, the nurses' failure to treat Mr. Simmons' sacrum, buttocks, and thigh with hydrocolloid dressing every 3-5 days between August 1, 2011 and September 19, 2011 more likely than not, in reasonable medical probability, directly caused skin wounds, including ulcers, to develop on Mr. Simmons' sacrum, buttocks, and thigh. Hydrocolloid dressing is used to treat skin ulcers so the nurses' failure to apply the hydrocolloid dressing every 3-5 days to Mr. Simmons could only result in Mr. Simmons developing skin ulcers on his sacrum, buttocks, and thigh. When Mr. Simmons arrived at Select Specialty on July 15, 2011, he had no skin breakdowns, wounds, redness, or discoloration anywhere on his body. Mr. Simmons, however, being a 69 year old elderly and chronically ill patient was at a high risk for developing pressure ulcers because he laid immobile in this bed during his treatment at Select Specialty. One of the major factors in the development of pressure ulcers is a prolonged pressure on a part due to the weight of the body or a limb. So the nurses' failure to reposition Mr. Simmons every two hours caused prolonged pressure on Mr. Simmons' sacrum, buttocks, and thigh, which more likely than not, in reasonable medical probability, caused skin wounds, including pressure ulcers, to develop on Mr. Simmons' sacrum, buttocks, and thigh. The nurses' failure to reposition Mr. Simmons every two hours, and in some cases reposition him only every ten hours, combined with the accumulation of urine and feces, which causes skin breakdown, more likely than not, in reasonable medical probability, directly caused skin wounds, including ulcers, to develop on Mr. Simmons' sacrum, buttocks, and thigh.

The trial court did not abuse its discretion in determining that Chachere's report adequately addressed the element of causation as it relates to bedsores. An expert is required to link his or her conclusions to the facts, but no "magical words" are required. *Bowie Mem'l Hosp.*, 79 S.W.3d at 53. While Select Specialty argues that Chachere's causation opinions are impermissibly conclusory, we conclude that her opinions are as, or more, specific than causation statements found to be adequate in other cases. Her report specifically identifies and links each alleged breach of the standard of care related to failure to treat Simmons with santyl dressings, failure to treat Simons with hydrocolloid dressing, and failure to reposition Simmons to his development of bedsores. *E.g., Bennett*, 256 S.W.3d at 817 (expert report was not impermissibly conclusory with regard to causation because it set "forth the mechanism of [patient's] injury, specifically (1) failure to provide adequate initial skin assessment, hydration, and nutrition led to the formation of ulcers, and (2) failure to provide skin care nursing and protocol interventions when decubitus ulcers were detected, as well as failing to optimize [patient's] nutrition and hydration led to formation of new ulcers and prevented healing of existing ulcers"); *Gallardo v. Ugarte*, 145 S.W.3d 272, 280 (Tex. App.—El Paso 2004, pet. denied) (report's giving examples of things that should have been done to prevent and treat decubitus ulcers—including more frequent repositioning—adequately addressed causation "by indicating that if the proper

23

steps had been taken the decubitus ulcers could have been prevented or at least prevented from progressing to stage IV").

Because we conclude that the trial court did not abuse its discretion in concluding that Sparks's and Chachere's adequately addressed standard of care, breach, and causation as to plaintiffs' claims related to bedsores, we overrule Select Specialty's second issue.[4]

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Sharp and Massengale.

---

[4] Select Specialty also challenges the sufficiency of the expert reports as they relate to claims that Simmons was left unattended in unsanitary conditions such that ants and gnats accumulated in his trachea tube. Because we have concluded that the reports are sufficient as to the claims related to bedsores, we need not reach Select Specialty's arguments about plaintiffs' other claims. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (case should proceed so long as expert reports are adequate as to one theory of liability).

24